## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| SAGE ENTERPRISES, INC., | ) | Case No. 04 B 05548 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| THE GOURMET CENTER, INC., | ) | Honorable Susan Pierson |
| | ) | Sonderby |
| Plaintiff, | ) | |
| v. | ) | Adv. No. 04 A 03014 |
| | ) | |
| HORACE FOX, JR., CHAPTER 7 TRUSTEE | ) | |
| OF SAGE ENTERPRISES, INC., LASALLE | ) | |
| BANK, N.A., SHELDON STILLMAN, and | ) | |
| GARY GREENBERG, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter came on for trial of the issues specified in the "Agreed Order (I) Scheduling

the Gourmet Center, Inc.'s Motion for Preliminary Injunctive Relief and Stay Relief for Hearing

and (II) Granting The Gourmet Center, Inc. Interim Relief" (the "Agreed Order"), entered on

July 27, 2004, all as more fully set forth below.

## BACKGROUND

Sage Enterprises, Inc. ("Sage"), Debtor in this Chapter 7 case, was at one time engaged

in the business of buying wholesale food products and selling them to the airline industry.

Defendant Sheldon Stillman is an owner and the Chairman of Sage, and defendant Gary

Greenberg is its president.

On or about February 13, 2004, four creditors filed an involuntary Chapter 7 petition against Sage, and an order for relief was entered on March 4, 2004. Shortly thereafter, defendant Horace Fox was appointed Chapter 7 trustee.

Prior to the filing of the petition, beginning in the early or mid-1980's, Plaintiff, The Gourmet Center, Inc. ("Gourmet"), supplied food products to Sage. During October and November of 2003, Gourmet entered into a series of transactions with Sage in which Gourmet agreed to sell and Sage agreed to purchase more than $850,000 worth of food products to be used in connection with Sage's business operations.[1]

Shortly after the last few shipments were invoiced, Gourmet received a letter dated November 21, 2003 from Gary Greenberg (Exhibit 2), advising, *inter alia*, that Sage would be ceasing operations and pursuing an orderly liquidation. The letter was received by Gourmet on November 24, 2003. The next day, Gourmet's counsel sent Greenberg a letter asserting reclamation rights on behalf of Gourmet[2] and giving "Notice of Intent to Preserve Trust Benefits" under both the Perishable Agricultural Commodities Act ("PACA") and the Packers and Stockyards Act ("PSA") (Exhibit 4). Attached to the November 25, 2003 letter was Gourmet's accounts receivable aged invoice report showing all open invoices for sales to Sage, including in each instance the invoice number, invoice date, due date for payment, and the amounts current and past due. A handwritten note at the bottom of the aged invoice report stated "TOTAL: $912,333.78."

On or about December 5, 2003, Gourmet's counsel sent Greenberg another letter (Exhibit

---

[1]   Gourmet alleges that the purchases aggregated approximately $912,000.
[2]   Gourmet asserted a "right to reclamation pursuant to Commercial Code Section 2-702, under both California and Illinois law." (Exhibit 4)

5), characterized as an "Addendum to Notice of Intent to Preserve Trust Benefits" (the "Supplemental Notice"). The Supplemental Notice, in addition to adding "Case Amount" and "Payment Terms" columns, also categorized the invoices by type of food product and by applicable statute, i.e., PSA or PACA. The notice listed the "[PSA] Grand Total" as $357,497.17, the "PACA Grand Total" as $118,022.95, and the "Combined Grand Total" as $475,520.12.

Two months later, in early February of 2004, Gourmet filed a complaint in the district court, seeking to enforce its alleged PACA and PSA trust rights. The complaint also alleged claims, *inter alia*, for fraud, reclamation, and breach of contract. Shortly after the complaint was filed, however, the involuntary petition against Sage automatically stayed further proceedings in the district court action.

On April 23, 2004, LaSalle Bank, N.A. ("LaSalle"), Sage's prepetition lender, filed a motion in the bankruptcy case for an interim order modifying the automatic stay to allow setoff and permitting use of cash collateral by the Trustee. Pursuant thereto, an agreed interim order was entered on April 29, 2004, providing for a limited use of cash collateral by the Trustee, directing the Trustee to deposit all proceeds of LaSalle's collateral into Sage's account at LaSalle, and authorizing LaSalle, on a provisional basis pending entry of a final order, to apply those deposits against the indebtedness due from Sage. The interim order further provided that, notwithstanding anything therein to the contrary, it was "entered without prejudice to the rights, remedies and priorities, if any, held by third parties under [PACA and PSA] or the reclamation rights, if any, of third parties pursuant to Commercial Code Section 2702 and/or any other applicable state or common law rights to the extent such rights are superior or senior to the lien in the Inventory asserted by LaSalle Bank." A similar reservation of rights was contained in the

final order, which was entered on June 4, 2004.

On June 14, 2004, Gourmet, having dismissed the dormant district court action, filed the instant adversary proceeding, seeking to enforce its alleged trust rights under PACA and PSA. Gourmet also asserted, as it had in the district court, claims for fraud, reclamation, and breach of contract. Two weeks later, Gourmet filed its Motion for Preliminary Injunctive Relief and Stay Relief, together with supporting memorandum, seeking, *inter alia*, to enjoin the Defendants from wrongfully dissipating PACA and PSA trust assets and reclaimed goods and requiring Defendants to provide an accounting and to turn over or pay for all such goods.

After the filing of this motion, Gourmet and the Defendants negotiated in detail the Agreed Order, establishing a bifurcated hearing process, as discussed more fully below, and granting interim relief to Gourmet. Specifically, the parties agreed that they would "present evidence and argument" at the first hearing, to be held on August 26, 2004, "necessary to resolve the following threshold requirements of PACA and PSA Trust Rights" claimed by Gourmet:

> a.    Whether [Gourmet's] sales of meat food products and packaged meat products to [Sage] qualify for trust protection under PSA for such sales;
> b.    Whether [Gourmet] sold food products to [Sage] on terms qualifying for PACA and PSA trust protection;
> c.    Whether [Gourmet's] sales of the particular types of food products sold to [Sage] qualify for trust protection under PACA;
> d.    Whether [Gourmet] gave the required notices to qualify for trust protection under PSA or PACA; and
> e.    Whether, to the extent the required notices were given, the particular sales identified by [Gourmet] qualify for PACA and PSA trust protection."

(Agreed Order, at ¶1)

The Agreed Order further provided that if the court "determines that [Gourmet] has Trust Rights," the Defendants would provide an accounting to Gourmet, including dates of disposition and present location of goods and tracing of proceeds, and then a second hearing would be held

on the accounting and any enforcement issues.  (Agreed Order, ¶4)[3]  This second hearing, concerning enforcement, would be held (assuming the court had determined that Gourmet had trust rights) within fourteen days after the accounting was provided, or as soon thereafter as the court's schedule would permit.  *Id.*

Pursuant to the Agreed Order, this bifurcated hearing process would not address Gourmet's claims for fraud or reclamation.  Those issues were reserved for subsequent determination in this adversary proceeding.

Discovery for the August 26, 2004 hearing was to be completed by August 16, 2004, and the parties were to exchange and file witness and exhibit lists by August 19, 2004.  (Agreed Order, ¶'s 3, 5)  The parties' joint pretrial statement was due by August 23, 2004, as were all motions in limine and objections to the admission of exhibits. (Agreed Order, ¶'s 6, 10)  Briefs "addressing those issues to be decided at the [August 26, 2004] Hearing" were to be filed by Defendants and Gourmet on August 13 and August 20, 2004, respectively. (Agreed Order, ¶'s 8, 9)

With respect to the issues to be decided at the August 26, 2004 hearing, the Agreed Order further provided as follows:

> "If any party wishes to raise any other threshold requirements, then that party shall notify all other parties no later than three (3) weeks prior to the hearing, otherwise such party will have waived those issue(s)."

(Agreed Order, ¶1)  Accordingly, unless a party gave notice at least three weeks prior to the hearing, it would have waived any arguments concerning threshold requirements of PACA and

---

[3]     Thus, while the first hearing would determine whether the particular types of food products were eligible for PACA trust protection, the extent to which trust rights attached to specific items "based upon ... disposition or location" would be reserved for the second hearing, as part of the accounting and the quantification and enforcement of the trust rights. *See* Agreed Order, ¶¶ 2(a), 4.

PSA trust protection that were not specifically listed in paragraphs 1(a) through (e), quoted above. No such notice was given.

In addition, with respect to the issue described in ¶1(c) above, i.e., whether Gourmet's sales of the "particular types of food products ... qualify for trust protection under PACA," the Agreed Order specifically provided:

> "For cause, and to the extent consistent with the applicable procedures for [Gourmet's] rights to injunctive relief and relief from stay, and the bifurcated proceeding agreed to herein, a party may request no later than two (2) weeks prior to the hearing, and any other party may oppose, further proceedings on the issue of 1(c) above."

(Agreed Order, ¶1) Neither Gourmet nor the Defendants made such a request.

Finally, the Agreed Order granted interim relief to Gourmet. Specifically, it provided:

> "11. Notwithstanding anything to the contrary and in addition to any other rights and remedies that [Gourmet] may have, [Gourmet's] rights, if any, under PACA, PSA, and the Illinois Commercial Code, 810 ILCS 5/2-702, shall be preserved to the extent they exist on the date of this Order, pending final resolution of the issues raised in the Motion. Without limiting the foregoing, Defendant Horace Fox, as Trustee, shall continue to collect and turn over cash collateral to Defendant LaSalle and LaSalle may continue to accumulate and disburse cash collateral in accordance with orders entered by this Court and may continue to hold any cash or other assets that it obtained from [Sage] before or after the order for relief was entered in this bankruptcy case subject to [Gourmet's] PACA, PSA, and reclamation rights, if any. Without affecting any rights and remedies in existence or created as of the date of this Order, each of the Trustee, Greenberg, Stillman, and [Sage] who in any respect directly or indirectly violates, diminishes, impairs, uses, consumes, or in any manner dissipates any of [Gourmet's] PACA, PSA, and reclamation rights, and such Defendant and LaSalle, shall make [Gourmet] whole for any such loss or injury occasioned thereby. Additionally, to the extent LaSalle has received Trust Property before or after the order for relief, or to the extent LaSalle has received [Gourmet's] reclaimed goods or the proceeds thereof ("Reclaimed Property"), LaSalle shall return such Trust Property or Reclaimed Property to [Gourmet], including any such property disbursed in accordance with orders of this Court or otherwise, following entry of a final and nonappealable order of this Court finding that [Gourmet] has valid and enforceable Trust Rights or reclamation rights."

-6-

(Agreed Order, ¶11)

At the trial on August 26, 2004, Gourmet put on one witness, Michael W. McGuire, Gourmet's chairman. McGuire has no technical food science knowledge and has never run a production facility, but he has been in the food business for approximately forty years. McGuire testified that he formed Gourmet in the early 1980's, along with several other individuals that had worked with him at a Del Monte Corporation subsidiary that supplied frozen composite meals for the airline industry. Gourmet is likewise a supplier of food products to the airline industry, and it works with several hundred manufacturers and suppliers. Gourmet obtains the food products from its suppliers and then sells them, in this case to Sage, for distribution to the airlines.

McGuire testified that because the airlines rely on Gourmet's expertise in connection with the types and quality of products provided, it is necessary for him to become familiar with the various food items sold by Gourmet. McGuire familiarizes himself generally, *inter alia*, through cutting and sampling the foods, comparing them to competitive products, reviewing manufacturers' brochures and videos about the manufacturing facilities and processes, and, in some instances, touring the facilities themselves.

One of the products sold by Gourmet for which it seeks PACA trust protection is potato chips, -- specifically, Classic Foods' sea salt and vinegar kettle chips. Exhibit 7, which is a stipulated list of ingredients for each of the foods in controversy, includes these kettle chips.[4] Although McGuire had not toured Classic Foods' manufacturing facility, he described generally

---

[4]    According to Exhibit 7, the kettle chip ingredients are: "Select Russet potatoes, expeller pressed high monounsaturated safflower and/or sunflower oil, vinegar powder [maltodextrin, modified food starch, vinegar solids (all from corn source)], sea salt, citric acid."

how potato chips are made based on his personal experience making them in his own kitchen. According to McGuire, he took a fresh potato, peeled it, took the eyes out, sliced it, fried it in oil that was "sizzling," and then added seasoning. He further testified, based on his general industry knowledge, that the kettle chips in question were prepared in a similar fashion, but on an industrial scale.

Gourmet initially claimed PACA trust protection for mustard. At the hearing, however, McGuire testified that he had never made mustard and has "very little knowledge" about it. Gourmet subsequently withdrew its claim with respect to mustard.[5]

Additional products for which Gourmet claims PACA trust protection are "H.R. Nicholson Orange Juice (boxes)" and "H.R. Nicholson Apple Juicy Juice." (Exhibit 7). McGuire testified that while he had not visited the H.R. Nicholson plant, he had visited a different vendor several times and had viewed the manufacturing process for orange juice. According to McGuire, the oranges go into a washing facility moving along a conveyor belt, while people standing on either side sort and pick out defective product. The oranges then move along to equipment that skins them mechanically, -- the skins going one way and the oranges going another, i.e., to a piece of equipment that crushes them. The resulting juice then moves on for further processing; it is either placed into a container as fresh orange juice, or it goes through the concentration process, which "minimizes" the water in it. According to McGuire, a substantial portion of the juice in the United States comes from Brazil in the form of concentrate. "You concentrate it down, and then you can move it in bladders the size of a 40-foot sea container." (August 26, 2004 transcript, at 120-21) McGuire testified that apple juice concentrate is made in a similar fashion.

---

[5]    Gourmet has also withdrawn its claim as to ketchup.

According to Exhibit 7, the orange juice in question is made from concentrate,[6] as is the apple juice.[7] McGuire explained that H.R. Nicholson "is not squeezing apples;" they are buying apple concentrate and then reconstituting it and packing it. (August 26, 2004 transcript, at 121)

With respect to the raspberry and strawberry preserves for which Gourmet also claims trust protection, McGuire testified that he had visited the Knott's Berry Farm production facility and observed the manufacturing process. According to McGuire, the fresh fruit is cleaned and sorted and then moves by conveyor belt to equipment that compresses it. He stated: "[T]he amount of compression varies. I think you can compressed [sic] it enough to make sludge out of it. But normally there is a standard of identity under federal code for the difference between preserves and jams and jellies and so forth." (August 26, 2004 transcript, at 122) McGuire further testified that as part of the process, corn syrup is added, "the high fructose for sweetening and thickening of the product and stability." (August 26, 2004 transcript, at 123)[8]

The final product for which Gourmet seeks PACA trust protection is Lamb Weston potato cubes.[9] With respect to the potato cubes, McGuire testified that "the process is quite similar to ... potato chips. This particular item obviously gets cubed and cooked, but then frozen." (August 26, 2004 transcript, at 123)[10]

---

[6]   According to Exhibit 7, the orange juice ingredients are: "Pure filtered water, concentrated orange juice, calcium citrate (calcium source), ascorbic acid (vitamin C)."
[7]   According to Exhibit 7, the apple juice ingredients are: "Apple juice (water, juice concentrate), ascorbic acid (vitamin C), malic acid."
[8]   According to Exhibit 7, the raspberry preserve ingredients are: "Red raspberries, high fructose corn syrup, corn syrup, pectin, citric acid." The strawberry preserve ingredients are the same, except of course that strawberries are used instead of raspberries, and sugar is also added.
[9]   Although Gourmet also requested PACA trust protection for olives, it subsequently withdrew its request. McGuire testified that he did not have knowledge about the processing of olives. Moreover, Gourmet's counsel suggested at oral argument on January 12, 2005 that the olives were withdrawn because they were "not within the net 30 days" required by the regulations. (January 12, 2005 transcript, at 64)
[10]   According to Exhibit 7, the potato cube ingredients are: "Potatoes, partially hydrogenated vegetable shortening (soybean oil and/or canola oil) and/or beef fat, enriched bleached flour (wheat flour, niacin, iron, thiamin mononitrate, riboflavin, folic acid), salt, modified food starch, spices, corn meal, garlic powder, onion powder, leavening (disodium dihydrogen pyrophosphate, sodium bicarbonate), natural flavor, colored with oleoresin paprika,

As for PSA, Gourmet's counsel stated that trust protection was claimed for two types of products, -- beef jerky and meat sandwiches. The components of the sandwiches, by weight, are set forth in Exhibit 6, which shows that they generally contain turkey, pastrami, ham, and/or bacon (as well as Swiss, Monterey Jack, and other cheeses).

McGuire also testified concerning the credit terms between Gourmet and Sage. As for Gourmet, McGuire was the individual with the final decision-making authority regarding credit terms. McGuire testified that the credit terms were memorialized, *inter alia*, in certain e-mails, copies of which were received into evidence as Exhibit 1. The e-mails were primarily between McGuire and Robert Sobczewski, who was, according to McGuire, the chief operating officer of Sage during the period in question. The e-mails document the negotiation and agreement, by McGuire and Sobczewski, during the period from December, 2002 to February, 2003, as to certain changes to the credit terms between Sage and Gourmet.

The first e-mail, dated December 11, 2002, is from Sobczewski and states: "[B]ased on current financial conditions in the airline industry, Sage has determined the 75%-10/net 11 ... payment terms currently in place ... can no longer be sustained by Sage. Therefore, effective Monday (12/16/02), Sage has elected to change the payment term to the airline industry standard followed by AA & UA and others to Net 30 days." (Exhibit 1, at SG0009-SG0010)  McGuire responded that Gourmet required more time to review and adjust the credit terms.  After additional correspondence, the parties decided to discuss the matter by phone on or about December 13, 2002.  Sobczewski sent McGuire an e-mail on that date after their discussion, stating: "[A]s we discussed on the call, Sage and Gourmet Center will remain on the current .75%-10/net 11 ... terms through 1/5/03. Effective with shipments dated 1/6/03 and forward, the

---

dextrose."

payment terms will be changed to the industry standard net 30. ... Please confirm the above via email by the close of business today." (Exhibit 1, at SG0006)

McGuire testified that Gourmet believed "the industry standard for large manufacturers is 30 days from date of shipment," which for Gourmet was also the invoice date. But "Sage would ask for and try to negotiate longer terms, meaning receipt of goods." (August 26, 2004 transcript, at 59-60). Accordingly, when McGuire sent his confirming email on December 13, 2002, he stated: "To recap in detail, Sage Enterprises and The Gourmet Center, Inc. agree to the following terms of sale. From today thru 1-05-03, terms are .75%, 10 net 11 from the date of invoice ... .[11] Effective with shipments beginning 1-6-03 terms are net 30 days from the date of invoice ... ." (Exhibit 1, at SG0005)

Approximately two months later, McGuire and Sobczewski negotiated a further change in payment terms. On February 10, 2003, Sobczewski sent McGuire an email referring to "this point of different interpretation between our companies regarding payment terms [which] has been in place for a long time and never been satisfactorily resolved (i.e., pre-paid and collect shipments ...)"[12] Sobczewski went on to explain:

> "Mike, in investigating this payable issue today, it appears the split between pre-paid and collect shipments is approx. 45%-55%. This split does cause an administrative problem for Sage, as we can only process bills in one of the two ways (date of receipt or date of invoice), neither method completely addresses this particular situation. One suggestion I would offer to resolve the problem would be to compromise the difference and go with 35 days from date of invoice for all invoices. However, I'm open to other suggestions you might have."

---

[11]    McGuire explained that "that meant that [Gourmet] would give [Sage] a three-quarter percent cash discount for paying [Gourmet] on day ten, and on day 11 there was no discount, but it was totally due on day 11 from date of invoice." (August 26, 2004 transcript, at 68)

[12]    According to Exhibit 3 (discussed below), Sage took possession of "collect" shipments immediately upon shipping (which appears to have occurred only once as to the shipments listed on Exhibit 3).

McGuire would not agree to the 35 day terms.  He testified that the parties ultimately agreed to 32 days from the invoice date.  He explained:

> "[Sage] couldn't set us up for payment date of invoice and date of receipt, it had to be one or the other.  And so we tried to calculate the number of days of transit.  [Sobczewski] came up with this five-day number, I came up with our data.  And in the end I think horse trading we picked 32 saying that accounts for the transit time on average."

(August 26, 2004 transcript, at 66)  The 32-day terms went into effect on February 19, 2003 and continued in effect through November of 2003.  (Exhibit 1, at SG0003; August 26, 2004 transcript, at 74)

The 32-day terms are reflected in a summary entitled "Details Concerning Alleged PACA Shipments," which was admitted into evidence by stipulation as Exhibit 3.  The exhibit sets forth, as to each shipment alleged to be subject to PACA trust protection,[13] the invoice number, invoice date, payment terms, receipt date, type of food, number of cases received, and dollar amount.

At the close of Gourmet's case, Defendants moved for a directed verdict.  They thereafter filed a written motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c).[14]

## DISCUSSION

Before reaching the substantive issues under PACA and PSA, the court will address Gourmet's contention that the August 26, 2004 trial, held in accordance with the terms of the Agreed Order, was merely a preliminary injunction hearing.  As an initial matter, the court notes

---

[13]      Again, Gourmet has withdrawn its trust claim as to many of these items, including ketchup, mustard, olives, hot sauce, and salsa.

[14]      As this case was tried without a jury, the appropriate vehicle is a motion for judgment on partial findings pursuant to Rule 52(c), applicable herein by virtue of Fed.R.Bankr.P. 7052, and not a motion for directed verdict or "for judgment as a matter of law" pursuant to Rule 50(a) (which applies only in jury trials and is not incorporated into the Bankruptcy Rules).

that an agreed order is a contract, and its interpretation is governed by ordinary rules of contract construction. *Thomasville Furniture Industries, Inc. v. The Elder-Beerman Stores Corp.*, 250 B.R. 609, 635 (S.D. Ohio 1998); *In re Delaney's II, Inc.*, No. 90 C 7264, 1991 WL 337625, at *2 (N.D.Ill. June 12, 1991); *In re Thornburg*, 277 B.R. 719, 726 (Bankr. E.D.Tex. 2002).[15]

Here, the parties' intention that the August 26, 2004 hearing constitute a trial on the merits of the five threshold requirements of PACA and PSA trust rights specified in the Agreed Order, and not merely a hearing on preliminary injunctive relief, is clear on the face of the Agreed Order itself. Not only did the parties state that those five issues would be "resolve[d]," "determine[d]," and "decided" at the August 26th hearing, but they also specified that if the court decided in Gourmet's favor, then an accounting would be provided, and a second hearing would be held concerning the accounting and any enforcement issues within fourteen days after delivery of the accounting.[16] Clearly, if a hearing to quantify and enforce the trust rights was to proceed based on the court's determination of the existence of such rights at the August 26th hearing, that determination would not be the type of provisional finding ordinarily made at a preliminary injunction hearing. *See* 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* §2950 (2d ed. 1995) (determinations made at preliminary injunction stage are only provisional; they are not binding at hearing on merits).

Moreover, a specific provision was included in the Agreed Order authorizing a party to request "further proceedings" on the very issue as to which Gourmet claims surprise,[17] i.e., whether the particular types of food products sold to Debtor qualify for trust protection under

---

[15] For purposes of the fundamental principles of contract construction applied here, the court need not determine which law applies, – whether state or federal, – as there would be no meaningful difference in the analysis.

[16] The accounting was to be delivered within thirty days after the court's ruling, and the enforcement hearing would be held fourteen days after that, or as soon thereafter as practicable in light of the court's schedule.

[17] *See* n. 23, *infra*.

PACA. (Agreed Order, ¶1(c)). Such a request for further proceedings had to be made at least two weeks prior to the hearing, and it could be opposed by the non-requesting party. The existence of such a mechanism for further proceedings, particularly after a month of pretrial activity, including discovery, briefing, motions in limine, and a joint pretrial statement,[18] is hardly reconcilable with the purpose and scope of a preliminary injunction hearing.

Finally, and perhaps most damaging to Gourmet's contention that a preliminary injunction hearing was intended, the Agreed Order already included protections against dissipation of the alleged trust assets, and those protections were to last (as would a preliminary injunction) through final adjudication of the PACA and PSA issues. Specifically, the order provided that Gourmet's rights, if any, under PACA and PSA would "be preserved to the extent they exist[ed] on the date of [the Agreed Order], *pending final resolution* of the issues raised in the Motion." (Agreed Order, ¶11; emphasis added)[19] As protection against dissipation, the order further provided, *inter alia*, that the Trustee would continue to collect and turn over cash proceeds to LaSalle, and that LaSalle: (1) would continue to receive and hold such proceeds subject to Gourmet's trust rights, (2) would make Gourmet whole for any loss or dissipation caused by any defendant, and (3) would return any trust assets received by it following entry of a final and nonappealable order finding that Gourmet had valid and enforceable trust rights under PACA and PSA. (Agreed Order, ¶ 11). The parties had thus already negotiated, crafted, and included in the Agreed Order itself the preliminary injunctive relief that Gourmet would enjoy pending a final adjudication, and no preliminary injunction would even issue if Gourmet

---

[18]     Although the parties were directed to file the pretrial statement jointly, they ultimately filed separate pretrial statements.

[19]     The motion raised all issues concerning PACA and PSA trust rights, as it sought not only a status quo injunction preventing dissipation, but also an order requiring Defendants to provide an accounting and immediately pay for any goods found to be subject to PACA or PSA protection.

prevailed at the August 26th hearing.  Indeed, counsel for Gourmet appeared to acknowledge as

much at oral argument.[20]

Gourmet's contention that the Agreed Order contemplated only a hearing on preliminary

injunctive relief is premised on the phrase "threshold requirements" and certain other language

appearing in ¶1 of the order.  Gourmet's counsel stated that she was "focus[ing] on" this

language "to support [that Gourmet's] belief was in good faith and founded:"

> "[W]e say 'threshold issues, requirements of PACA and [PSA] rights.'  Then
> it goes on to say down below, 'For cause and to the extent consistent with the
> applicable procedures for [Gourmet's] right to injunctive relief and relief from
> stay and the bifurcated proceedings agreed to herein.'"

(August 26, 2004 transcript, at 134)  According to Gourmet, "put[ting] those two sentences

together" somehow supports Gourmet's view that the hearing was merely for preliminary

injunctive relief.  Counsel for Gourmet failed, however, to articulate *how* the combination of

these two phrases gives rise to her proffered interpretation of the Agreed Order, other than to

suggest: "That meant, you know, we were doing this on a really short time frame." (August 26,

2004 Transcript, at 134).

Gourmet appears to be relying on the reference to injunction procedures in the second of

the proffered phrases to put a different spin on the word "threshold" in the first phrase; i.e., all

Gourmet had to do was satisfy the low "threshold showing" required at a preliminary injunction

hearing.  *See, e.g., Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (low "threshold ...

---

[20]    *See, e.g.,* January 12, 2005 Transcript, at 41-42, where counsel states: "But if we present enough evidence,
... that our chances are better than negligible ... then basically all that happens here is that we reserve things for a
later trial ... .  That's what a win on our part means." *See also* pages 37-38, where counsel states:

> "We didn't produce evidence on great and irreparable, because as I think the court is aware,
> there is various court orders now that have money that is set aside, I guess in LaSalle, ... if we
> can establish the PACA or PSA trust, to the extent we can, you know, everyone agrees to comply
> with that. ... If we can prove these things, then the money will stay there."

showing," i.e., better than negligible standard, as to likelihood of success on merits). Indeed, Gourmet contends, in its post-trial brief, that it has satisfied its "prima facie threshold case within the context of the hearing for injunctive and stay relief, as required under the [Agreed] Order.." (Gourmet's Opposition to Defendants' Motion for Non-Suit, at 18). However, the phrase "threshold requirements" in ¶1 of the Agreed Order unambiguously refers to the five specific issues set forth therein, and the second phrase, -- with its reference to procedures for injunctive relief, -- does not transmute those "threshold requirements" into the "threshold showing" required to obtain a preliminary injunction.

Moreover, the second phrase was contained in the provision authorizing requests for further proceedings on the issue of ¶1(c) of the Agreed Order (i.e., whether the particular types of food products qualify for PACA trust protection). The phrase merely established that requests for such further proceedings had to be for "cause" and "consistent with the applicable procedures for [Gourmet's] rights to injunctive relief and relief from stay, and the bifurcated proceeding" set forth in the Agreed Order. If the non-requesting party believed that there was no cause for such proceedings or that they would be inconsistent with the procedures governing Gourmet's request for relief, that party could oppose the request. This phrase, which broadly articulates a basis for possible objection to such "further proceedings," does not specify, or even suggest, that the hearing would merely be for preliminary injunctive relief.

Gourmet is, in short, attempting to effectively rewrite the terms of the Agreed Order.[21] Indeed, counsel stated that she believed the parties were not "thinking it through completely ... in the choice of the language" and invited the court to "look at it, not so much in the words

---

[21]    *See also* January 12, 2005 Transcript, at 80, where Gourmet transforms the "resolution" of "threshold requirements" into the "resol[ution of] ... a preliminary injunction."

...use[d], but ... in the context of the potential outcomes." (January 12, 2005 transcript, at 43-44). Unless the agreement is ambiguous, however, the court may look only to the language used by the parties.[22]

Gourmet's proffered interpretation of the language used in the Agreed Order is unreasonable and irreconcilable with the agreement as a whole. The language admits of only one reasonable construction, and it is clear from the Agreed Order that the parties intended a hearing on the merits of the five specific issues set forth in ¶1. Gourmet's effort to effectively rewrite the terms of the order appears to be an eleventh hour attempt to secure a lower burden of proof and a second bite at the apple, because it was not adequately prepared for trial on the specified issues.[23]

## Gourmet is not entitled to the benefits of a PSA trust.

The PSA trust provisions are codified at 7 U.S.C. §196(b) (hereafter, "§196(b)"), which provides in relevant part:

---

[22]     The court notes, moreover, that under the terms of the Agreed Order, Gourmet would fare no better with respect to "potential outcomes" of the August 26th hearing, since, as discussed above, no preliminary injunction would even issue if Gourmet prevailed; the Agreed Order itself already provided all the preliminary injunctive relief that Gourmet needed (and to which it agreed) pending a final adjudication.

[23]     As indicated above, Gourmet claimed surprise concerning the issue of the composition and processing of the particular types of food products it sold to Debtor. Although the question of PACA eligibility for those particular food products was specifically set forth in ¶1(c) of the Agreed Order, Gourmet asserted that the composition and processing issue was never briefed by LaSalle and had arisen just two days before trial. Counsel stated that the issue had therefore "caught [Gourmet] a little off guard" and had "caught [Gourmet] in a position where [it] didn't have an opportunity to respond to it in the form of expert testimony." (August 26, 2004 transcript, at 94 and 99). As noted by LaSalle's counsel at argument, however, the issue was not only listed in the Agreed Order, but was also specifically addressed in LaSalle's pretrial brief filed on August 13, 2004. In fact, Gourmet's attempts to, in effect, rewrite the terms of the Agreed Order began when it filed its reply to that brief on August 20, 2004, shortly after the close of discovery (and with it the expiration of Gourmet's opportunity to garner additional evidence on the food products issue), wherein Gourmet complains that LaSalle is improperly focusing on specific food items and avoiding the "one simple issue" set for hearing. In its reply, Gourmet not only attempts to transform "threshold requirements" into "threshold showing" (pretrial reply, at 2) but even goes so far as to rewrite the specific issues set for trial. (*See id.*, where Gourmet characterizes the issue set forth in ¶1(b) of the Agreed Order as whether Gourmet "sold food products to Sage on terms *of a general nature* qualifying for PACA and PSA protection") (emphasis added).

> All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust *for the benefit of all unpaid cash sellers of such livestock* until full payment has been received by such unpaid sellers.

(Emphasis added.) The term "livestock" is defined at 7 U.S.C. §182(4) to mean "cattle, sheep, swine, horses, mules, or goats – whether live or dead."[24]

Gourmet claims the benefit of a PSA trust for sales of beef jerky and meat sandwiches, ranging from turkey to ham to beef. (August 26, 2004 Transcript, at 26) Gourmet wisely acknowledges that these items are not cattle, sheep, swine, horses, mules, or goats, but are instead "meat food products," as defined in the statute. (*Id.* at 26-27; *see also* Gourmet's Opposition to Defendants' Motion for Non-Suit, at 15).[25] While Gourmet, therefore, is clearly not an "unpaid cash seller of ... livestock" within the meaning of §196, quoted above, it nonetheless claims that its sales of meat food products gave rise to a PSA trust in its favor.[26]

Gourmet relies on the "plain language" of the statute extending the trust *res* to meat food products, receivables, and proceeds, - - carefully ignoring the equally plain language limiting the class of beneficiaries. In an attempt to divert attention from the latter, Gourmet proclaims that the "question here is the scope of the trust itself." (August 26, 2004 Transcript, at 27)

---

[24]    The PSA trust created pursuant to §196(b), like the PACA trust (discussed below), is a non-segregated, floating trust, and the livestock seller/beneficiary need not trace assets in order to establish entitlement to trust protection. *See, e.g., In re Gotham Provision Co., Inc.,* 669 F.2d 1000, 1009-10 (5th Cir. 1982), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed. 2d 111 (1982); *see also JSG Trading Corp. v. Tray-Wrap, Inc.,* 917 F.2d 75, 78 (2d Cir. 1990); 7 C.F.R. §46.46(b) (re PACA trust). Moreover, the seller takes priority in trust assets over a lender holding a security interest therein. *See Gotham,* 669 F.2d at 1009-10; *see also Albee Tomato, Inc. v. A.B. Shalom Produce Corp.,* 155 F.3d 612, 615 (2d Cir. 1998) (re PACA trust).

[25]    "Meat food products" are defined as "all products and by-products of the slaughtering and meat-packing industry – if edible." 7 U.S.C. §182(3). "Livestock products" are defined as "all products and by-products (other than meats and meat food products) of the slaughtering and meat-packing industry derived in whole or in part from livestock." 7 U.S.C. §182(5).

[26]    Although some of the sandwiches for which Gourmet seeks protection contained turkey, Gourmet did not specifically claim protection under PSA's poultry trust provision, 7 U.S.C. §197(b). In any event, the poultry trust provisions of §197(b) are similar to the livestock trust provisions of §196(b), and Gourmet would fare no better with respect to its turkey sandwiches than with respect to its other products.

There is no question, however, as to the *scope* of the statutory trust; it clearly extends to

the derivative products and proceeds identified in §196(b). The question at issue here is whether

Gourmet is a beneficiary of such a trust, i.e., whether its sales of meat food products to Sage

gave rise to a statutory trust in the first instance.[27]

It is clear from the language of the statute that a trust only arises in connection with sales

of "livestock." While the trust *res* extends to derivative products, it does so only for the benefit

of the unpaid sellers of "such livestock." This issue was directly addressed in *Liberty Mutual*

*Ins. Co. v. Bankers Trust Co.*, 758 F.Supp. 890 (S.D.N.Y. 1991), *rev'd on other grounds*, 969

F.2d 1384 (2d Cir. 1992). There, Rotches Pork Packers had purchased, *inter alia*, dressed hogs

from Arbogast & Bastian, a company in the business of purchasing and slaughtering livestock

and then reselling the livestock and its products. After Rotches ceased operations and stopped

payment on twenty checks issued to Arbogast, Arbogast filed a Chapter 11 petition.

In the Arbogast bankruptcy, fifty-seven sellers of livestock to Arbogast (the "Livestock

Sellers") filed claims based on nonpayment for livestock deliveries. The bankruptcy court

subsequently authorized certain pro rata distributions to the Livestock Sellers, including the

proceeds of a surety bond that had been issued by Liberty Mutual to Arbogast to ensure payment

to farmers for their livestock. Liberty Mutual then filed an adversary complaint, as subrogee of

Arbogast and as assignee of the Livestock Sellers, against Rotches and its secured lender,

Bankers Trust Company. Liberty contended, *inter alia*, that a statutory trust arose not only upon

the sales of livestock to Arbogast by the Livestock Sellers (with Arbogast as trustee and the

---

[27]    Indeed, Gourmet goes so far as to carefully misquote LaSalle's pretrial brief as stating that "PSA trusts
attach only to livestock or live poultry ..." (Gourmet's pretrial reply, at 9). LaSalle, however, stated that "PSA
trusts attach only to *sales of* livestock or live poultry." (LaSalle's pretrial brief, at 6; emphasis added). By omitting
the words "sales of," Gourmet erects a straw man that it can proceed to easily slay, thereby avoiding the true issue, --
i.e., the appropriate class of beneficiaries, -- to which it has no colorable response.

Livestock Sellers as beneficiaries), but also upon the sale of dressed hogs by Arbogast to

Rotches (with Rotches as trustee and Arbogast as beneficiary).

While the district court found that the sales of livestock to Arbogast gave rise to a

statutory trust (with Arbogast as trustee) for the benefit of the Livestock Sellers, it held that no

trust was created upon sale of the dressed hogs by Arbogast to Rotches. The court explained:

> [A]ccording to the unrebutted affidavit of David A. Rotches ... , Rotches, Inc.
> did not purchase livestock from [Arbogast], a requirement for a Section 196(b)
> trust. ... Liberty Mutual argues that a dressed hog is the equivalent of a dead
> hog. However, it ignores the statutory definition of meat food products as
> "all products and by-products of the slaughtering and meat packing industry –
> if edible." 7 U.S.C. 182. The term "dressed," means killed, bled and more or
> less completely prepared for cooking." *Websters 3rd Int'l Dictionary* (unabridged)
> at 689, 3rd Ed. 1966, G.C. Merriam. ... A dressed hog need only be cut into parts
> for cooking purposes. Thus, under the statutory definition, dressed hogs would
> be meat food products and not livestock. ... [T]he Court finds that the sales by
> [Arbogast] to Rotches, Inc. did not consist of livestock and as a result, there was
> no statutory trust on behalf of [Arbogast] as to Rotches, Inc.'s funds.

*Liberty Mutual*, 758 F.Supp. at 895-96.

On appeal, the Second Circuit noted that Liberty had abandoned its theory that a PSA

trust arose upon Arbogast's sale of the dressed hogs to Rotches. The court nonetheless stated

that it "agree[d] with the ruling of the district court on this issue," *Liberty Mutual*, 969 F.2d at

1388 n. 3, but reversed the decision on other grounds.

Gourmet observes that this statement was mere dictum and points to certain other cases

in support of what it characterizes as the appropriate "expansive view" of the statute. (*See*

Gourmet's Opposition to Defendants' Motion for Non-Suit, at 15.) For example, Gourmet relies

on *In re Frosty Morn Meats, Inc.*, 7 B.R. 988 (M.D.Tenn. 1980), which involved the sale of

livestock by various middlemen. The bankruptcy trustee for Frosty Morn objected to the trust

claims of the middlemen (even though they were selling "livestock"), seeking to limit the term

"sellers" (in §196(b)) to owner-producers. The bankruptcy judge rejected this contention, explaining that in the livestock industry, animals are sold by owner/producers either directly to packers or through "market agencies" or "dealers." The court held that it was clear from the statutory definitions of these terms[28] and the Act's remedial purpose that these middlemen were "sellers" within the meaning of §196(b), regardless of whether they took title to the livestock. The district court, agreeing with and adopting the bankruptcy judge's opinion on this issue, further stated:

> It seems clear from the Act and the supporting legislative
> history that Congress intended to protect the entire chain of commerce
> *from the individual producers to the slaughter house.*

*Id.* at 998 (emphasis added). Gourmet, though correctly quoting this passage in its brief, cites it as support for the radically different proposition that the "statute was created to protect the entire stream of commerce *from livestock sellers to meat and meat food products' sellers.*" (Gourmet's pretrial reply, at 10). As Gourmet is undoubtedly aware, the case did not involve sellers of meat food products, and the court did not suggest that trust protection extended beyond the slaughterhouse.[29]

*In re Gotham Provision Co., Inc.*, 669 F.2d 1000 (5th Cir. 1982), cited by Gourmet in its pretrial reply brief, is equally inapposite. Gourmet states that *Gotham* "is contrary to [Defendants'] 'livestock only' theory and defeats their claims." (Gourmet's pretrial reply, at 11). In support, Gourmet quotes the *Gotham* court's observation that "due to the nature of the meat

---

[28]    The statute defines "market agency" as "any person engaged in the business of (1) buying or selling in commerce livestock on a commission basis or (2) furnishing stockyard services." 7 U.S.C. §201(c). The term "dealer" is defined as "any person, not a market agency, engaged in the business of buying or selling in commerce livestock, either on his own account or as the employee or agent of the vendor or purchaser." 7 U.S.C. §201(d).
[29]    Gourmet revised this statement by the time of its *post*-trial brief, after the issue had been discussed at trial. *See* Gourmet's Opposition to Defendants' Motion for Non-Suit, at 15 ("the statute was created to protect the entire stream of commerce involving livestock sellers to the slaughterhouse").

packing business where, once slaughtered, animal carcasses are quickly cut into meat products

and commingled, it is a practical impossibility to identify which receivables correspond to which

seller's livestock." *Gotham*, 669 F.2d at 1011. This observation, however, was made by the

Fifth Circuit merely to explain its holding that the PSA trust is a nonsegregated floating trust and

that tracing of assets is not required. *See also Liberty Mutual*, 969 F.2d at 1391 (noting that Fifth

Circuit made this observation "to reject the tracing requirement"). *Gotham* says nothing about

sellers of meat food products being PSA trust beneficiaries; nor do the other cases cited by

Gourmet.

Indeed, Gourmet ultimately acknowledged that the beneficiary issue was not decided in

the cases it had cited. Gourmet nonetheless continued to press its position, urging that the only

case on point was the Second Circuit's decision in *Liberty Mutual* and that the statement made

therein was mere dictum.[30] However, while the Second Circuit's statement approving the district

court's ruling on the beneficiary issue was dictum, the district court's holding clearly was not.

That portion of the district court's decision was not reversed, and it continues to provide support

for the proposition that sales of meat food products do not give rise to PSA trusts.

Moreover, cases construing the similar trust provisions contained in PACA constitute

additional support on this issue.[31]    For example, in *Endico Potatoes, Inc. v. CIT*

---

[30]    Gourmet stated in its post-trial brief that it had "acknowledged in oral argument that on this precise issue,
the only case on point, *Liberty Mutual*" was contrary to Gourmet's position, "albeit in dicta." Gourmet further
stated: "In the other cases cited, this issue was similarly not part of the holdings of the cases below. *In re Frosty
Morn* ... involved only sellers of livestock to the slaughterhouse. *In re Gotham* ... held that '... it is a practical
impossibility to identify which receivables correspond to which seller's livestock,' and ... whether there was a cash
seller of livestock products was not an issue in the case. ... Defendants are quite correct that no case holds that
[Gourmet] is entitled to a PSA trust for the unpaid meat and meat food products sold to Sage. However, it is equally
true that, based on [Gourmet's] review of the case law, no case holds (rather than implying or stating in dicta) to the
contrary." (Gourmet's Opposition to Defendants' Motion for Non-Suit, at 15-16.)

[31]    As acknowledged by Gourmet's counsel (August 26, 2004 transcript, at 26), the provisions of PACA are
similar to those of PSA, and cases interpreting one statute are relevant in construing the other. *See, e.g., Tom Lange
Co., Inc. v. Lombardo Fruit and Produce Co. (In re Lombardo Fruit and Produce Co.)*, 12 F.3d 806, 811 (8th Cir.
1993) ("PACA's trust provision is modeled on the one appearing in ... PSA," and "the wording of the statutes is

*Group/Factoring, Inc.*, 67 F.3d 1063 (2d Cir. 1995), the Second Circuit construed the PACA

trust provision, codified at 7 U.S.C. §499(e)(c)(2), which provides in pertinent part that

> "[p]erishable agricultural commodities received by a commission merchant, dealer,
> or broker in all transactions, and all inventories of food or other products derived
> from perishable agricultural commodities, and any receivables or proceeds from the
> sale of such commodities or products, shall be held by such commission merchant,
> dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such
> commodities or agents involved in the transaction, until full payment of the sums
> owing in connection with such transactions has been received by such unpaid
> suppliers, sellers, or agents. ... ."

In *Endico*, the suppliers of a variety of products, including cole slaw, potato salad, and

frozen onion rings, contended that a PACA trust was created upon the sale of not only perishable

agricultural commodities, but also their derivatives. *Id.* at 1070. The appellate court held that

the suppliers' "creative reading" of section 499(e)(c)(2) "conflict[ed] with the language of the

statute and ignore[d] its distinction between transactions that create the trust and the assets held

within the trust." *Id.* The court noted that the statute distinctly separates perishable agricultural

commodities from their derivative products, and the phrase defining the transactions that give

rise to the trust speaks only of perishable agricultural commodities. Moreover, "the provision

indicates that the trust is created for the benefit of 'all unpaid suppliers or sellers of such

*commodities.*'" *Id.* (emphasis in original) Finally, the court observed that the broader definition

of trust *assets* (to include not only the commodities but also derivative products) is necessary in

order for the trust to accomplish its purpose. Quoting from the district court opinion, the Second

Circuit explained:

> "The trust must cover a broader category of goods, i.e., the products derived from

---

remarkably similar.") Indeed, the house report accompanying the proposed trust provisions (which were added to
PACA in 1984) states: "[A]n amendment very similar to this was added to the Packers and Stockyards Act. This
legislation would provide a remedy by impressing a trust in favor of the unpaid seller or supplier ... in the same
manner that has been provided by 'trust' amendments to the Packers and Stockyards Act adopted in 1976." H.R.
Rep. No. 98-543, at 4 (1983).

-23-

perishable produce, if the statute is to afford any protection whatsoever to suppliers; otherwise, all the producer would need to do is process the fresh produce he receives to be free of any PACA liability."

*Id.* (quoting from *A & J Produce Corp. v. CIT Group/Factoring, Inc.*, 829 F.Supp. 651, 657-58 (S.D.N.Y. 1993), *rev'd on other grounds*, 67 F.3d 1063 (2d Cir. 1995)).

The court's analysis of the language of §499(e)(c)(2) applies with equal force to the PSA trust provision. The statute distinctly separates livestock from meat and meat food products, and the phrase defining the transactions that give rise to the trust speaks only of livestock. 7 U.S.C. §196(b). Moreover, the provision specifically indicates that the trust is created "for the benefit of all unpaid cash sellers of such livestock."

Gourmet, in its closing brief, finally makes an effort to address this language specifically designating the protected class of beneficiaries. Gourmet's effort is, however, remarkably unpersuasive. According to Gourmet,

> [T]he terms "there from" [sic] in the statute should be interpreted in connection with the first clause "all livestock purchased by a packer in cash sales." In other words, as [Gourmet] is a cash seller of meat food products *derived from livestock*, ... [Gourmet] is a party who can assert beneficiary status to the PSA trust. The inclusion of meat food products as those *derived from livestock* in the definition of livestock in the first clause of the statute, is an inclusive defined term and the rest of the statute continues that meaning.

(Gourmet's Opposition to Defendants' Motion for Non-Suit, at 14; emphasis in original).[32] While the term "therefrom" in §196(b) does indeed refer to "[a]ll livestock purchased by a packer in cash sales," the use of that term does not effect an "inclusion of meat food products ... in the definition of livestock," as suggested by Gourmet. As indicated above, the statute

---

[32]    *See also* January 12, 2005 transcript, at 49, where Gourmet's counsel argues: "... [T]he entire first part ..., in other words, 'all livestock' through the 'therefrom,' is intended to be the definition per se of livestock. And so when you continue with the rest of the sentence, when you talk about 'to be held by such packer in trust for the benefit of all cash sellers of such livestock,' the livestock used the second time references back up to the entire definition. That's our view."

distinctly separates livestock from meat food products and separately defines them in a provision

that has application throughout the Act. Nothing in §196(b) states or even implies that those

definitions do not apply for purposes of this provision. Gourmet's tortured attempt to import

derivative "meat food products" into the definition of "livestock," thereby creating what it calls

an "inclusive defined term" for application of the trust provisions, is both far-fetched and

meritless.

In sum, no trust arose upon sale by Gourmet of meat food products to Sage, and it is not

entitled to assert trust rights as a beneficiary under §196(b).[33]  Inasmuch as Gourmet cannot

maintain Counts IV, V, and VI without a favorable finding on this issue, Horace Fox, as Chapter

7 trustee for the estate of Sage, is entitled to judgment in his favor on Counts IV, V, and VI of

the Amended Complaint. With respect to the non-debtor defendants, LaSalle Bank, Stillman,

and Greenberg, the court now questions whether it has subject matter jurisdiction to entertain

Counts I through VI.[34]  As discussed further below, the court will dispose of that issue in

connection with its ruling on the pending motion to dismiss, *inter alia*, Counts IX and XI for

lack of subject matter jurisdiction.


**Gourmet is not entitled to the benefits of a PACA trust.**

As discussed above, a PACA trust arises only upon sale of "perishable agricultural

commodities," and not their derivatives. "Perishable agricultural commodities" are defined as

"[f]resh fruits and fresh vegetables of every kind and character," whether or not "frozen or

---

[33]    In light of this disposition, the court need not address any of the other statutory prerequisites to trust entitlement.

[34]    The court notes that it has an obligation to raise the issue of subject matter jurisdiction *sua sponte* at any point in the proceedings when it appears that jurisdiction may be lacking. *See, e.g., Levin v. Attorney Registration and Disciplinary Commission*, 74 F.3d 763, 766 (7th Cir. 1996), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2553, 135 L.Ed.2d 1072 (1996); *Buethe v. Britt Airlines, Inc.*, 749 F.2d 1235, 1238 n. 3 (7th Cir. 1984).

packed in ice." 7 U.S.C. §499a(b)(4)(A).

Gourmet asserts PACA trust rights with respect to its sales of potato chips, potato cubes,

fruit juices, and fruit preserves. According to Gourmet, these products constitute fresh fruits and

fresh vegetables, and not derivative products.[35]

PACA does not define "fresh fruits and vegetables." However, the United States

Department of Agriculture ("USDA"), which is vested with regulatory authority under PACA,

has promulgated a regulation clarifying what commodities are included in this category. Prior to

1996, that regulation provided as follows:

> "Fresh fruits and fresh vegetables" include all produce in fresh form generally
> considered as perishable fruits and vegetables, whether or not packed in ice
> or held in common or cold storage, but does not include those perishable fruits
> and vegetables which have been manufactured into articles of food of a dif-
> ferent kind or character. The effects of the following operations shall not
> be considered as changing a commodity into a food of a different kind or
> character: Water or steam blanching, chopping, color adding, curing,
> cutting, dicing, drying for the removal of surface moisture; fumigating, gas-
> sing, heating for insect control, ripening and coloring; removal of seed, pits,
> stems, calyx, husk, pods, rind, skin, peel, et cetera; polishing, precooling, re-
> frigerating, shredding, slicing, trimming, washing with or without chemicals;
> waxing, adding of sugar or other sweetening agents; adding ascorbic acid or
> other agents used to retard oxidation; mixing of several kinds of sliced,
> chopped, or diced fruits or vegetables for packaging in any type of containers;
> or comparable methods of preparation.

7 C.F.R. §46.2(u) (1995).

In 1996, the regulation was amended to specifically include oil blanching as a process

which would not be considered as changing a product into a food of a different kind or character.

Prior to the enactment of that amendment, the Second Circuit issued its decision in *Endico*,

---

[35]   *But see* Gourmet's pretrial reply brief, where it unwittingly acknowledges that these foods are merely
derivative products. Gourmet states: "[T]he trust applies to both the perishable agricultural commodities themselves
and to products derived from those commodities. ... Congress created the statutory trust under PACA to protect
suppliers of produce *and* produce-derived products ... . Therefore, [Gourmet's] products of potatoes, potato chips,
ketchup, hot sauce, mustard, fruit juice, fruit spreads and olives, in its PACA notice *...which are clearly produce-
derived products* may be protected under PACA." (Gourmet's pretrial reply, at 6-7; emphasis added).

-26-

discussed above, wherein it considered the availability of PACA trust protection for sales of certain frozen potato products. The bulk of the potatoes were processed by first steam peeling and slicing. They were then water blanched for 14 to 16 minutes at 160 to 168 degrees fahrenheit and then "surface seared" through immersion in a hot oil bath for 30 to 90 seconds in order to dry them prior to freezing. *Endico*, 67 F.3d at 1071. The suppliers asserted, without contradiction, that this surface searing was a necessary part of the water blanching operation. The purpose of the water blanching and oil searing was to prevent the potatoes from turning black when frozen. *Id.*

The Second Circuit found these potato products to be "fresh vegetables" within the meaning of the statute, explaining:

> Because the Act specifically protects both fresh and *frozen* fruits and vegetables, and because the regulations provide that water blanching will not take produce outside of PACA's protection, we find that [the suppliers] may recover for potatoes that are oil seared *as part of the water blanching process.*

*Id.* (emphasis added). In other words, although the amendment specifically adding oil blanching had not yet been formally enacted, the court found that the oil searing, as part of the *water* blanching operation, was a necessary part of the freezing process. *Id.* The court also noted that the USDA's position, as set forth in its proposed amendment to the regulation,[36] was not without significance. *Id.* at 1071 n. 5.

While the bulk of the suppliers' potato products in *Endico* were processed as set forth above, a portion of them went through an additional step. In certain instances, this additional step consisted of a light oil spray (made at the request of certain customers) which would enable the potatoes ultimately to be oven baked rather than deep fried. *Id.* at 1071. In other instances,

---

[36]    Although the amendment was not yet enacted, the comment period had closed, and the rule had not been withdrawn. *Id.* at 1071 n. 5.

the additional step was the application of a light breading.  The Second Circuit denied PACA

trust protection as to these products, holding:

> These treatments are not part of the freezing process, but are intended to prepare
> the potatoes for a certain type of cooking, thereby changing the character of the
> potatoes.

*Id.*

This latter portion of the *Endico* decision has been superseded by a further amendment to

the USDA's regulation, effective June 2, 2003, adding battering and coating as processes that

will not change a product into a food of a different kind or character.  *See* 7 U.S.C. §46.2(u).  A

similar decision in *In re Long John Silver's Restaurants, Inc.*, 230 B.R. 29 (Bankr. D.Del. 1999),

concerning batter-coated french fries, is likewise superseded by the amendment.  The USDA, in

its narrative accompanying the new rule, noted that as a result of a large Chapter 11 case

involving disputes over $11 million in coated and battered potato products, the Frozen Potato

Products Institute ("FPPI") had asked the USDA for a written advisory opinion to clarify

whether or not coated or battered potato products were covered under PACA.  The USDA's

Agricultural Marketing Service ("AMS") provided the opinion in August of 2000.  In 2003,

when the amendment was enacted, the agency explained:

> In its response to FPPI, dated August 16, 2000, AMS concluded that
> coating or battering does not alter the essential character of the potato products
> because the operation leaves them virtually indistinguishable in appearance
> and texture from those that have not been coated or battered. ...
> ...
> This final rule is being issued in response to the [FPPI's] request that
> AMS codify its opinion that the coating or battering of fruits and vegetables is
> an operation that does not change a perishable agricultural commodity into a food
> of a different kind or character.

68 Fed.Reg. 23377-78 (2003).

The 2003 amendment was challenged in *Fleming Companies, Inc. v. USDA*, 322

-28-

F.Supp.2d 744 (E.D.Tex. 2004), where the court upheld it as the product of a legitimate rulemaking process, valid under the doctrine of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Several months later, the district court for the District of Delaware issued a decision in Fleming's Chapter 11 case, concerning canned goods and battered and coated frozen potato products. *See In re Fleming Companies, Inc.*, 316 B.R. 809 (D.Del. 2004). As to the canned goods, the court held that the products were not within the ambit of "fresh" fruits and vegetables, "declin[ing] to ignore PACA's plain language and legislative history or to discard common sense in order to embrace [the suppliers'] position." *Id.* at 814. With respect to the battered and coated potato products, the court denied the suppliers' motion for summary judgment, without prejudice, finding that it was not bound by the decision of the Texas district court as to the validity of the 2003 amendment. *Id.*[37]

Gourmet relies on these developments, which it refers to as the "french fry wars," to contend that there is a "new USDA expansive view" of what constitutes perishable agricultural commodities. (August 26, 2004 Transcript, at 20, 24) At oral argument, counsel for Gourmet urged that "with the new USDA rules[,] ... the potato cubes and the potato chips are really beyond any serious argument." (August 26, 2004 Transcript, at 23) And in its pretrial reply brief, Gourmet stated: "Just as French fries qualify under PACA, so too do [Gourmet's] potato cubes and potato chips. These items are merely cut-up potatoes." (Gourmet's pretrial reply, at 8).

Gourmet's potato cubes and potato chips are not, however, merely cut-up potatoes. They are, in each instance, cooked. According to McGuire, the potato chips are fried, and the potato

---

[37]   The court invited briefs from the parties on that issue.

cubes are prepared in a "similar" fashion; they "get[] cubed and cooked." (August 26, 2004

Transcript, at 116, 123)[38] Nothing in the amendments or the related case law cited by Gourmet

suggests that such cooked potatoes are within the ambit of the statute.

Indeed, the amendments dealt very precisely with certain specific processes that are

performed *preparatory* to cooking. For example, the 1996 amendment added oil blanching,

which the USDA noted does not cook the product:

> This rule extends PACA coverage to include frozen fruits and vegetables
> that are oil-blanched, especially frozen french fried potato products. ...
> Information submitted to this Agency by the Frozen Potato Products Insti-
> tute ... indicates that potatoes cannot be economically frozen and shipped long
> distances unless they first undergo oil blanching. As pointed out by the American
> Frozen Food Institute, oil blanching, like water and steam blanching inactivates
> enzymes *without cooking the product*.

61 Fed.Reg. 13385 (1996) (emphasis added).

The 2003 amendment likewise added processes performed preparatory to cooking. The

USDA, in its statement accompanying the new rule, noted that the majority of FPPI's members,

who account for 95 percent of all frozen potato products in the United States, coat or batter their

potato products prior to oil blanching, as follows:

> The operation involves dipping potato strips into a mixture of water and natural
> vegetable starch (e.g., potato or rice). Subsequently, a crisping agent such as
> dextrin and/or a chemical leavening agent are added to the product. The product
> is then air blown to remove all but a thin layer of coating, oil blanched, and then
> finally frozen.

68 Fed.Reg. 23377 (2003). Again, the product may be coated and blanched, but it is not fried or

otherwise cooked.

---

[38]    Gourmet's counsel stated at oral argument: "[T]he potato cubes are ... cooked. There is no dispute about
that." (January 12, 2005 Transcript, at 67) Indeed, McGuire testified that "[t]his particular item ... comes forward as
a frozen product that would go to a entree manufacturer or an airline caterer who is putting it on your lunch or dinner
plate if you're getting a hot meal. ... [I]t's ready to go. They just take that frozen precooked potato and put it in."
(August 26, 2004 Transcript, at 123-24)

There is, of course, no mention in the regulation of frying or, for that matter, of baking, broiling, or other methods of cooking.    Nor is frying a "method[] of preparation" that is "comparable" to those listed in the regulation.  *See* 7 C.F.R. §46.2(u) (2005).  The narrow scope of permissible heat applications is set forth in the regulation in exacting detail.    It allows "heating for insect control, ripening, or coloring;" it also allows heat for the purpose of "[w]ater, steam, or oil blanching."    The limited range of permissible heating processes clearly does not include frying, baking, and other cooking methods, which are dissimilar to those listed both in terms of degree and purpose.

In sum, the amendments made in 1996 and 2003, while expanding to a limited extent the permitted processing operations, have not inaugurated the regulatory free-for-all heralded by Gourmet.  The processes performed on Gourmet's potato products are not "comparable methods of preparation" within the meaning of the regulation; instead, they are processes which transformed the potato products "into articles of food of a different kind or character."  7 C.F.R. §46.2(u) (2005).[39]

Gourmet's claim with respect to orange juice and apple juice is equally meritless.  As indicated above, McGuire testified that after the fruit is washed and skinned, it is crushed.  The resulting juice is then either placed into containers as fresh orange or apple juice or it goes instead through a concentration process, which "minimizes" the water in it.  The juice in this case was concentrated.  According to McGuire, Gourmet's supplier, H.R. Nicholson, purchased concentrate and then reconstituted and packed it.

Gourmet acknowledged that heat was used in the concentration process.  In Appendix A

---

[39]    *See also Sun Glo of Idaho, Inc. v. Trade West Merchandising Inc.*, 42 Agric.Dec. 1290 (1983) (while category "perishable agricultural commodities" includes fresh vegetables in frozen form, it does not include "frozen *baked* potatoes," which are "fresh potatoes that have been 'manufactured' into food of a different character") (emphasis added).

to its post-trial brief, Gourmet summarizes the processing of its fruit juices as follows: "Fresh fruit is peeled, squeezed, heated to concentrate then blended with flavorings and preservatives." (Gourmet's Opposition to Defendants' Motion for Non-Suit, Appendix A).  Gourmet's counsel likewise acknowledged the heating process at oral argument, stating that "[c]oncentrating does involve heating ... ."  (January 12, 2005 Transcript, at 66)  She further stated, "[T]he juice is cooked ... . There is no dispute about that." (*Id.* at 67.)

It is clear that the fresh fruit has been transformed here into a product of a different kind or character.  First (even assuming that the fresh juice would be a covered product), heat has been applied to the extent necessary to reduce the juice to concentrate.  Gourmet has failed to establish that this heating process comes within the limited range of permissible heat applications discussed above.  Moreover, the regulation allows "drying for the removal of *surface* moisture."  7 C.F.R. §46.2(u) (2005) (emphasis added).  As in *In re L. Natural Foods Corp.*, 199 B.R. 882, (Bankr. E.D.Pa. 1996), it "strains credulity" to suggest that the amount of water removed from juice to create "concentrate" is merely "moisture" on the "surface" of the product.  *Id.* at 888.[40]  Gourmet has failed to establish that the "drying" involved here was limited to the removal of surface moisture (or any "comparable method[] of preparation").

Finally, Gourmet has also failed to establish that its strawberry and raspberry preserves constitute "fresh fruits" within the meaning of the statute.  McGuire testified that the fresh fruit is cleaned, sorted, and then "compressed." (August 26, 2004 transcript, at 122)  According to McGuire, "the amount of compression varies," – apparently depending upon whether preserves, jams, or jellies are being prepared. *Id.*

---

[40]    In *L. Natural*, the court denied PACA trust protection as to sales of dried apricots and prunes, finding that the drying processes had removed substantially more than "surface moisture" from the fresh apricots and plums. 199 B.R. at 888.

The preserves are then "cooked." Gourmet's counsel stated at oral argument, in response to a question from the court: "[Y]es, the preserves are cooked ... . There is no dispute about that." (January 12, 2005 Transcript, at 67). Gourmet likewise, in the chart attached to its post-trial brief, summarizes the processing of its preserves as follows: "Fresh strawberries plus sweetener, preservatives, then heat."[41] Gourmet again failed to establish that this cooking process comes within the limited range of permissible heat applications discussed above. Accordingly, it has failed to establish that it is entitled to PACA trust protection with respect to the strawberry and raspberry preserves, and the court finds that the processes employed have transformed the fruits into foods of a different kind or character.

In sum, no trust arose upon sale by Gourmet of the potato chips, potato cubes, fruit juices, or fruit preserves, and it is not entitled to assert trust rights as a beneficiary under PACA.[42] Inasmuch as Gourmet cannot maintain Counts I, II, or III without a favorable finding on this issue, Horace Fox, as Chapter 7 trustee for the estate of Sage, is entitled to judgment in his favor on Counts I, II, and III of the Amended Complaint. As indicated above, however, the court now questions whether it has subject matter jurisdiction to entertain Counts I through VI as against the non-debtor defendants, LaSalle Bank, Stillman, and Greenberg.

There is, of course, no question that the court has subject matter jurisdiction to determine whether a statutory trust exists, because the bankruptcy court always has jurisdiction to determine whether property constitutes property of the estate. *See, e.g., In re United Fruit & Vegetable, Inc.*, 191 B.R. 445, 451 (Bankr. D.Kan. 1996). Had the court found that a statutory trust was created in this case, any funds subject thereto would not have constituted estate

---

41    Gourmet included a similar summary with regard to the raspberry preserves.
42    In light of this disposition, the court need not address Gourmet's argument concerning the credit terms extended to Sage or any of the other statutory prerequisites to trust entitlement.

-33-

property.   While the court has found that no trust was created, Counts I through VI nonetheless appear to be unrelated to the bankruptcy case, i.e., a suit by one of the Debtor's creditors against non-debtor third parties that may have no impact on the amount of assets in this estate or the allocation of assets among creditors.

The court currently has under advisement the fully briefed motion to dismiss, *inter alia*, Counts IX and XI for lack of subject matter jurisdiction.  While the court believes that there is no principled distinction on the jurisdictional issue between those counts and Counts I through VI of the Amended Complaint, Gourmet shall have fourteen days to file whatever additional submissions it deems necessary to address the issue of subject matter jurisdiction over Counts I through VI against the non-debtor defendants.  The court will then dispose of the issue in connection with its ruling on the aforesaid pending motion to dismiss.

## CONCLUSION

For all of the reasons set forth above, Horace Fox, as Chapter 7 trustee for the estate of Sage, is entitled to a judgment on partial findings on Counts I through VI of the Amended Complaint. This opinion constitutes the court's findings of fact and conclusions of law under Bankruptcy Rule 7052 in connection therewith. The court will, however, defer entry of judgment in favor of the trustee until it disposes of these counts completely in connection with its ruling on the pending motion to dismiss, *inter alia*, Counts IX and XI for lack of subject matter jurisdiction. The Gourmet Center, Inc. shall have fourteen days to file whatever additional submissions it deems necessary to address the issue of subject matter jurisdiction, but only with respect to Counts I through VI as they relate to the non-debtor defendants, LaSalle Bank, Sheldon Stillman, and Gary Greenberg. LaSalle, Stillman and Greenberg shall have seven days to respond to any such submissions.

Date:
    DEC __ 1 2005

ENTERED

SUSAN PIERSON SONDERBY
United States Bankruptcy Judge