## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| SAGE ENTERPRISES, INC., an Illinois | ) | |
| corporation, | ) | Case No. 04 B 05548 |
| | ) | |
| _____Debtor._____ | ) | |
| THE GOURMET CENTER, INC., a | ) | |
| California corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 04 A 03014 |
| | ) | |
| HORACE FOX, JR., AS CHAPTER 7 | ) | |
| TRUSTEE OF SAGE ENTERPRISES, INC., | ) | |
| LASALLE BANK, N.A., | ) | |
| SHELDON STILLMAN, and | ) | |
| GARY GREENBERG, | ) | |
| | ) | |
| Defendants. | ) | Hon. Susan Pierson Sonderby |

### MEMORANDUM OPINION

This matter comes before the court on the motion of Gary Greenberg and Sheldon Stillman to dismiss Counts IX, X, XI and XIV of the First Amended Complaint pursuant to Rules 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure, made applicable herein by Federal Rule of Bankruptcy Procedure 7012(b),[1] and the motion of LaSalle Bank, N.A. ("LaSalle") to dismiss Counts XII, XIII and XIV pursuant to the same rules, or pursuant to Rule 41(b).

For the following reasons, Greenberg and Stillman's motion will be granted. Counts IX and

---

[1] All references to Rules herein are to the Federal Rules of Civil Procedure, which have been made applicable in this proceeding pursuant to certain Federal Rules of Bankruptcy Procedure.

XI will be dismissed for lack of subject matter jurisdiction. Count X will be dismissed because the plaintiff, The Gourmet Center, Inc. ("Gourmet"), lacks standing to bring the cause of action raised in that count. Count XIV will be stricken pursuant to Rule 12(f).

LaSalle's motion will be granted in part and denied in part. Count XII will be dismissed because the plaintiff lacks standing to bring the cause of action asserted in that count. As for Count XIII, the court has subject matter jurisdiction, and Gourmet has standing to bring the cause of action asserted therein. Moreover, the request for dismissal of that count under Rule 12(b)(6) for failure to state a claim or pursuant to Rule 41(b) for failure to comply with a court order will be denied.

As discussed further below, the court also raised the issue of jurisdiction over Counts I through VI with respect to Stillman, Greenberg, and LaSalle. After consideration of the parties' submissions, the court will dismiss Counts I through VI only as to Stillman and Greenberg.

## BACKGROUND

On February 13, 2004, an involuntary petition under chapter 7 of title 11 of the United States Code (the "Code") was filed against Sage Enterprises, Inc., an Illinois corporation ("Sage"). An order for relief under chapter 7 was entered on March 4, 2004. Horace Fox, Jr. was appointed trustee of Sage's bankruptcy estate (the "Trustee"), and he continues to serve in that capacity.

Prior to the entry of the order for relief, Sage was engaged in the business of buying wholesale food products and selling them to the airline industry. Defendant Stillman is an owner and the chairman of Sage, and defendant Greenberg is its president. As discussed in detail below, defendant LaSalle provided Sage with a secured revolving credit facility.

During October and November of 2003, Gourmet entered into a series of transactions with

2

Sage in which Gourmet agreed to sell and Sage agreed to purchase more than $900,000 worth of food products, including potato chips, potato cubes, fruit juices and fruit preserves (collectively, the "Goods"), to be used in connection with Sage's operations.

On June 21, 2004, Gourmet filed a proof of claim in Sage's bankruptcy case asserting a secured claim in the amount of $912,333.78. LaSalle filed a proof of claim on September 10, 2004, asserting a $3,707,566.12 secured claim. Neither Stillman nor Greenberg has filed a proof of claim in the Sage bankruptcy case.

On April 23, 2004, LaSalle filed a motion in the bankruptcy case for an interim order modifying the automatic stay to allow setoff and permitting use of cash collateral by the Trustee. An agreed interim order was entered on April 29, 2004, providing for use of cash collateral by the Trustee, directing the Trustee to deposit all proceeds of LaSalle's collateral into Sage's account at LaSalle, and authorizing LaSalle, on a provisional basis pending entry of a final order, to apply those deposits against the indebtedness due from Sage. The interim order further provided that, notwithstanding anything therein to the contrary, it was "entered without prejudice to the rights, remedies and priorities, if any, held by third parties under the [Perishable] Agricultural Commodities Act of 1930 as amended [7 U.S.C.§ 499 *et seq.*] ("PACA"), the Packers and Stockyard[s] Act of 1921 [7 U.S.C. §§ 181-229] ("[PSA]"), or the reclamation rights, if any, of third parties pursuant to Commercial Code Section 2702 and/or any other applicable state or common law rights to the extent such rights are superior or senior to the lien in the Inventory asserted by LaSalle Bank." A similar reservation of rights was contained in the final order, which was entered on June 4, 2004 (the "Cash Collateral Order").

On June 15, 2004, Gourmet filed a twelve-count adversary complaint against the Trustee,

3

LaSalle, Stillman, and Greenberg (the "Original Complaint"). In Counts I-VI of the Original Complaint, Gourmet sought various forms of relief under PACA and PSA against all defendants, including LaSalle (the "PACA/PSA Counts").[2]

The court conducted a trial on the PACA/PSA Counts and entered a Memorandum Opinion on December 1, 2005 (the "PACA/PSA Opinion"). The court concluded therein that Gourmet is not entitled to assert trust rights as a beneficiary under PACA or PSA and that the Trustee is entitled to judgment on partial findings in his favor on the PACA/PSA Counts. The court noted that there is no question the bankruptcy court has subject matter jurisdiction to determine whether a PACA or PSA trust exists, because the bankruptcy court always has jurisdiction to determine whether property constitutes property of the estate. The court questioned, however, its subject matter jurisdiction over the PACA/PSA Counts to the extent that Gourmet sought relief against the non-debtor defendants, *i.e.*, Stillman, Greenberg and LaSalle. Because jurisdiction was an issue with respect to certain of the other counts of the Amended Complaint, which are now addressed in this opinion, the court deferred entry of judgment in favor of the Trustee pending this ruling.

Shortly before the trial on the PACA/PSA Counts, LaSalle, Stillman, and Greenberg filed motions to dismiss certain counts of the Original Complaint. Those dismissal motions were withdrawn without prejudice pursuant to an Agreed Order entered on November 2, 2004 (the "Agreed Order"), which granted Gourmet, *inter alia,* "leave to file an amended complaint, including

---

2

Gourmet alleged that Sage held the Goods and their proceeds in trust pursuant to PACA and/or PSA. Seeking to enforce its rights in the purported trust, Gourmet requested in the Original Complaint the following relief against all of the defendants: (i) the entry of a judgment for violation of PACA for failure to account and pay properly as required thereunder (Count I); (ii) the entry of a judgment for violation of PACA for failure to maintain the statutory trust (Count II); (iii) the enforcement of the PACA trust (Count III); (iv) the entry of a judgment for violation of PSA for failure to account and pay promptly as required thereunder (Count IV); (v) the entry of a judgment for violation of PSA for failure to maintain the statutory trust (Count V); and (vi) the enforcement of the PSA trust (Count VI).

Counts IX [seeking judgment against LaSalle, Stillman and Greenberg for actual fraud] and X [seeking damages against Stillman and Greenberg for constructive fraud]."

Gourmet filed its fourteen-count First Amended Complaint on November 22, 2004, about three months after the trial on the PACA/PSA Counts (the "Amended Complaint"). In Counts I through VI of the Amended Complaint, Gourmet repeated its requests for various forms of relief associated with PACA and PSA. In the Amended Complaint, however, Gourmet no longer sought such relief against LaSalle.

Thereafter, Stillman and Greenberg filed a joint motion to dismiss Counts IX, X, XI and XIV of the Amended Complaint pursuant to Rule 12(b)(6). LaSalle filed a motion to dismiss Counts XII, XIII and XIV pursuant to Rule 12(b)(6) or Rule 41(b).

## Allegations Common to Counts IX Through XIV of the Amended Complaint

The present motions to dismiss are targeted to Counts IX through XIV of the Amended Complaint. These counts are premised primarily on the same factual allegations.

Specifically, Gourmet alleges that since 1996, LaSalle has provided a secured revolving credit facility to Sage (the "Credit Facility"). Stillman and Greenberg executed separate written guarantees in favor of LaSalle, each capped at $600,000 (the "Guarantees").

Gourmet further alleges that during the first half of 2003, Gourmet and other suppliers would not extend credit to Sage. The suppliers insisted on being paid cash on delivery due to Sage's then deteriorating financial situation. LaSalle, in order to address the liquidity problem and enable Sage to pay its suppliers on 30-day credit terms, provided Sage with an additional $2 million term loan due December 31, 2003 (the "Term Loan"). At that time, Stillman and Greenberg's exposure under

their Guarantees was increased by $1 million each to a total of $3.2 million. LaSalle agreed that in the event the Term Loan was repaid by its due date, the liability cap in the Guarantees would be reduced back down to $600,000 each. According to Gourmet, LaSalle agreed to the reduction in the Guarantees "to provide incentive to Stillman and Greenberg to manage and use Sage's assets to ensure payment in full of the Term Loan and Credit Facility." (Amended Complaint, ¶ 23).

By autumn 2003, Sage was still suffering from financial problems, and Gourmet and other suppliers renewed their demands for COD payment terms. According to Gourmet, Sage rebuffed those demands because the proposed terms would endanger the company's ability to devote cash to paying LaSalle. Gourmet alleges that it and other suppliers were convinced to continue extending credit by express assurances of payment made by Stillman, which were implicitly endorsed by Greenberg. According to Gourmet, Stillman and Greenberg knew that the promises of payment were false because of Sage's dire financial situation.

Moreover, their alleged false promises were purportedly made as part of a deliberate scheme with LaSalle. Specifically, according to Gourmet, LaSalle, Stillman and Greenberg devised a plan designed to ensure the ongoing shipment of inventory to Sage on credit terms. The resulting influx of inventory would work to protect LaSalle's lien under the Credit Facility and to mollify LaSalle enough to cause it to advance to Sage an additional $2 million thereunder. That advance under the Credit Facility was made on November 24, 2003 and was used to pay off the Term Loan, thereby benefitting both Stillman and Greenberg through the reduction of their liability on the Guarantees. In addition, the $2 million increase in the Credit Facility was repaid from monies received by Sage upon sale of the inventory, including the Goods shipped by Gourmet.

6

## Prayers for Relief in the Subject Counts

In Count IX of the Amended Complaint, entitled "Fraud Against Stillman and Greenberg," Gourmet contends that it shipped the Goods based on Stillman and Greenberg's false assurances of payment. Consequently, Gourmet was damaged in the amount remaining unpaid due to the false representations. Gourmet asks for entry of judgment in its favor and against Stillman and Greenberg in the amount of $912,000, plus punitive damages and costs.

Count X is entitled "Breach of Fiduciary Duty Against Stillman and Greenberg." Gourmet contends therein that Sage was insolvent at the time the Goods were shipped and that Stillman and Greenberg, as directors of an insolvent corporation, owed fiduciary duties to Sage's creditors. These duties, according to Gourmet, included a duty not to use corporate assets to improve their individual positions to the detriment of Sage's creditors and a duty to be forthright and candid as trustees of the corporate trust. Gourmet further alleges, on information and belief, that Stillman and Greenberg were aware of Sage's insolvency and the risk that creditors who had extended credit terms would not be paid in full. According to Gourmet, Stillman and Greenberg breached their duties to all of Sage's creditors by causing Sage to stop payments to Gourmet and other suppliers in order to reduce their personal liability under the Guarantees. Their duties to Sage's creditors were also breached when they made false, or at least reckless, assurances of full payment to Gourmet. Gourmet contends that the breaches "induced it to sell" the Goods to Sage. Therefore, Gourmet asserts that it is entitled to a judgment in its favor against Stillman and Greenberg in the amount of $912,000, plus punitive damages and costs.

In Count XI, Gourmet alleges that Stillman and Greenberg's breaches of their fiduciary duties give rise to a presumption of constructive fraud. Gourmet contends that it was damaged by that

fraud, entitling it to judgment in its favor and against Stillman and Greenberg in the amount of $912,000, plus punitive damages and costs.

In Count XII, Gourmet seeks relief against LaSalle for its alleged wrongful inducement of Stillman and Greenberg's breaches of fiduciary duties. LaSalle's purported wrongful inducement damaged Gourmet and thus entitles it to judgment in the amount of $912,000 against LaSalle.

In Count XIII, brought against Sage and LaSalle, Gourmet seeks a declaration that it has a valid reclamation claim. Moreover, according to Gourmet, the reclamation claim is superior to LaSalle's lien because LaSalle lost its "good faith purchaser" status under the Uniform Commercial Code as a result of the alleged wrongful acts outlined in the Amended Complaint.

Count XIV, although styled as a count seeking declaratory and injunctive relief, is really a rehash of the causes of action asserted in Counts I-XIII of the Amended Complaint and parrots the relief requested in those prior counts. For example, in Count XIV Gourmet requests the entry of a judgment against Stillman and Greenberg in the amount of $912,000, plus "other fraud damages." That prayer for relief is neither declaratory nor injunctive in nature and is already the subject of Counts IX and XI.

## The Motions to Dismiss

Stillman and Greenberg contend in their motion that while they had, as directors, fiduciary duties toward the insolvent Sage's creditors, Gourmet has not properly alleged breaches of those duties. They argue that their actions were based on legitimate corporate concerns and that "[e]xtinguishing the Guarantees was not impermissible self-dealing, preferring insiders over unsecured creditors; it was merely the inevitable consequence of the Directors doing their duty by

8

paying a secured creditor first ... ." (Memorandum of Law in Support of Motion of Sheldon Stillman and Gary Greenberg to Dismiss Counts IX, X, XI, and XIV of First Amended Complaint, p. 9). Alternatively, Stillman and Greenberg argue that Counts IX, X and XI should be dismissed for failure to state claims for fraud with specificity as required by Rule 9(b). LaSalle, in its motion, contends, *inter alia*, that Illinois law does not recognize a breach of fiduciary duty claim under the circumstances pleaded by Gourmet.

During a hearing on a discovery dispute, the court questioned whether subject matter jurisdiction existed over those counts which ask for judgment in favor of Gourmet against non-debtors on state law theories. The court also raised the issue of whether Gourmet had standing to bring claims that appear to belong to the estate and thus must be brought by the Trustee. *See* McCready v. White, 417 F.3d 700, 702 (7th Cir. 2005) (federal court has duty to ensure that subject matter jurisdiction and standing are proper at all stages of the litigation).


## Positions of the Parties Concerning Jurisdiction

The parties thereafter filed papers addressing the subject matter jurisdiction and standing concerns. Stillman and Greenberg argue that the court lacks subject matter jurisdiction over the fraud counts asserted against them, *i.e.*, Counts IX and XI. They further contend that while the court has subject matter jurisdiction over Count X (breach of fiduciary duty), Gourmet lacks standing to assert that cause of action.

LaSalle concedes that this court has jurisdiction over the wrongful inducement of fiduciary breach count (Count XII) but contends that Gourmet lacks standing to assert it. LaSalle further concedes that this court has jurisdiction over, and that Gourmet has standing to bring, the

9

reclamation count (Count XIII), but it reiterates the argument that the count should be dismissed for failure to state a claim under Rule 12(b)(6). LaSalle also urges the court to involuntarily dismiss all counts against it pursuant to Rule 41(b), because Gourmet purportedly exceeded the leave given it to amend the Original Complaint. Specifically, according to LaSalle, the Agreed Order only gave Gourmet leave to amend certain counts of the Original Complaint. Gourmet did not comply with the Agreed Order because the PACA/PSA counts asserted against LaSalle were not included in the Amended Complaint. According to LaSalle, the unauthorized "amendment" in the form of the withdrawal of LaSalle from those counts was particularly egregious, because it occurred after the conclusion of the PACA/PSA trial, in which LaSalle had participated extensively.

The Trustee filed a submission joining in many of the arguments made by Stillman, Greenberg and LaSalle. He also filed a counterclaim against Gourmet, asserting that any money recovered by Gourmet under the fiduciary breach counts (Counts IX through XI) should be turned over to the bankruptcy estate. The Trustee notes that the counterclaim was filed "as a protective measure." According to the Trustee, the "protective" pleading was needed because he had not yet made a decision as to whether he could bring, as representative of Sage's estate, breach of fiduciary duty claims against Stillman, Greenberg, and LaSalle. While this matter was under advisement, the Trustee filed an adversary complaint (the "Trustee's Complaint") against Stillman, Greenberg, and others (but not LaSalle) seeking damages resulting from, *inter alia*, breaches of fiduciary duty. The Trustee alleged that the defendants had "[built] up the Debtor's inventory with product for which [they] did not intend to pay in order to create receivables that would pay off the Debtor's secured lender (a result in which [they] had a vested personal interest)." (Trustee's Complaint, ¶ 33).

10

## DISCUSSION

The court will first address the arguments concerning jurisdiction. <u>Winslow v. Walters</u>, 815 F.2d 1114, 1116 (7th Cir. 1987) (where motion to dismiss is based on alternative grounds of lack of jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6), court should consider jurisdictional arguments first and then, if jurisdiction exists, proceed to Rule 12(b)(6) arguments).

## Subject Matter Jurisdiction Over the Causes of Action Asserted in Counts IX and XI (Actual and Constructive Fraud)

Rule 12(b)(1) states in pertinent part that "[e]very defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter. . ." Fed. R. Civ. P. 12(b)(1). Rule 12(h) further provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. P. 12(h).

"Rule 12(b)(1) motions are premised on either facial or factual attacks on jurisdiction." <u>Kalamazoo Realty Venture L.P. v. Blockbuster Entertainment Corp.</u>, 249 B.R. 879, 884 (N.D. Ill. 2000) (<i>citing</i> <u>Villasenor v. Industrial Wire & Cable, Inc.</u>, 929 F.Supp. 310, 311 (N.D. Ill. 1996)). A facial attack "questions the sufficiency of the pleadings and thus is limited to what has been pleaded." <u>In re Daley</u>, 224 B.R. 307, 311 (Bankr. S.D.N.Y. 1998). A factual challenge to jurisdiction "questions whether the facts underlying the claim of jurisdiction are adequate to support the assertion of jurisdiction and, therefore, no presumption of truthfulness attaches to the allegations

11

of the complaint." Id.; see also Gervasio v. United States, 627 F.Supp. 428, 430 (N.D. Ill. 1986).

The party seeking to invoke subject matter jurisdiction bears the burden of proving it by "competent proof." NLFC, Inc. v. Devcom Mid-America, Inc., 45 F.3d 231, 237 (7th Cir. 1995), cert. denied, 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); see also, In re Shuman, 277 B.R. 638, 645 (Bankr. E.D. Pa. 2001). Competent proof means "proof to a reasonable probability that jurisdiction exists." Target Market Publishing, Inc. v. ADVO, Inc., 136 F.3d 1139, 1142 (7th Cir. 1998) (internal quotations and citations omitted). Allegations based on "information and belief" are insufficient to constitute proof. America's Best Inns, Inc. v. Best Inns of Abilene, L.P., 980 F.2d 1072, 1074 (7th Cir. 1992).

Subject matter jurisdiction "defines the court's authority to hear a given type of case." U.S. v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). The "[s]ubject matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'" GTE South, Inc. v. Morrison, 957 F.Supp. 800, 803 (E.D. Va. 1997) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 433, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989) (further citations omitted)).

Section 1334(b) of title 28 of the United States Code is the statutory source of bankruptcy jurisdiction and is thus the starting point for the bankruptcy judge to ascertain whether jurisdiction exists. In re Cary Metal Products, Inc., 152 B.R. 927, 930 (Bankr. N.D. Ill. 1993), aff'd, Zerand-Bernal Group, Inc. v. Cox, 23 F.3d 159, 161 (7th Cir. 1994) (citing In re Spaulding & Co., 131 B.R. 84 (N.D. Ill. 1990)). Section 1334 provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

Jurisdiction over matters "arising under" the Bankruptcy Code or "arising in" a bankruptcy case is limited to questions that arise during the bankruptcy case and concern the administration of the bankruptcy estate, such as whether to discharge a debtor. Zerand-Bernal, 23 F.3d at 162. These matters are termed "core proceedings" and, for the most part, are enumerated by statute in 28 U.S.C. § 157(b)(2). Barnett v. Stern, 909 F.2d 973, 979 (7th Cir. 1990).

A "related to" proceeding is not considered a core proceeding because it does not invoke a substantive right created by the Bankruptcy Code and is one that could exist outside of bankruptcy. The Supreme Court has stated that "related to" proceedings include: "(1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate." Celotex Corp. v. Edwards, 514 U.S. 300, 308, n. 5, 115 S.Ct. 1493, 1499, n. 5, 131 L.Ed.2d 403 (1995) (citations omitted).

The Court observed in Celotex that "Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth." Id. at 307-08. The Court then noted that the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits had adopted "with little or no variation" the test for "related to" jurisdiction enunciated by the Third Circuit, i.e.: a proceeding is related to a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id. at 308 n.6 (quoting Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). The Court remarked that the Second and Seventh Circuit Courts "seem to have adopted a slightly different test." Id. (citing In re Turner, 724 F.2d 338, 341 (2d Cir. 1983); In re Xonics, Inc., 813 F.2d 127, 131 (7th Cir. 1987); Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir. 1989)).

According to the Seventh Circuit Court of Appeals, a proceeding is within "related to"

13

bankruptcy jurisdiction if its resolution affects the amount of assets available for distribution or the

allocation of assets among creditors. Xonics, 813 F.2d at 131. In a later opinion, the Court

explained the holding in Xonics:

> [Xonics] holds that disputes among creditors of a bankrupt come
> within the federal bankruptcy jurisdiction only if they involve
> property of the estate or if resolving two creditors' intramural
> squabble will affect the recovery of some other creditor.

. . .

> We held in Xonics that the "related to" jurisdiction encompasses only
> disputes that affect the payments to the bankrupt's other creditors or
> the administration of the bankrupt's estate.

In re Kubly, 818 F.2d 643, 645 (7th Cir. 1987).

Although the Supreme Court characterized the Seventh Circuit's test as perhaps only

"slightly different" from the broad Pacor test, it is ordinarily described as a narrow one. The narrow

construction of relatedness is premised on Constitutional concerns. See In re FedPak Systems, Inc.,

80 F.3d 207, 213-14 (7th Cir. 1995) ("[w]e have interpreted 'related to' jurisdiction narrowly 'out

of respect for Article III' . . . as well as to prevent the expansion of federal jurisdiction over disputes

that are best resolved by the state courts") (citing Home Ins., 889 F.2d at 749).

The Court in Xonics presented two hypothetical situations to illustrate how the test works:

> Suppose A, B, and C claim interests in a pool of oil. If A is a
> bankrupt, the bankruptcy court could determine the interests of all
> three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1),
> because only after identifying the "property" of the estate may the
> court apportion that property among creditors. But if the estate
> should disclaim any interest in the pool, only the dispute between B
> and C would remain. The resolution of that dispute would not affect
> the creditors of the bankrupt, and there would be no source of
> jurisdiction. That B and C might also be creditors of the bankrupt
> would not enlarge the court's power; there is no jurisdiction to

14

> resolve all disputes among creditors of a bankrupt ... That two
> creditors have an internecine conflict is of no moment, once all
> disputes about their stakes in the bankrupt's property have been
> resolved. ...
>
> . . .
>
> When the disposition of the abandoned assets cannot possibly affect
> other creditors, there is no reason for the bankruptcy court's
> jurisdiction to linger . . .
>
> Yet there could be a link between the disposition of claims to
> abandoned property and the treatment of other creditors. A plan of
> reorganization might say: "The estate abandons all of its claims to
> the Empire State Building. To the extent Creditor A receives any
> money on account of its claims against the Empire State Building,
> this money shall be counted toward satisfaction of its other,
> outstanding debt." If a reduction of A's debt left more money for
> Creditor C (who had never claimed an interest in the Empire State
> Building), then the decision who owned the Empire State Building
> still would be important to the winding up of the estate. There would
> be jurisdiction in the district court - and in the bankruptcy court on
> the parties' consent - under § 157(c)(1).

<u>Xonics</u>, 813 F.2d at 131-32 (citations omitted).

A number of courts relying on the reasoning of <u>Xonics</u> have recognized the possibility that

there could be a sufficient effect on the estate to confer jurisdiction if a creditor's successful suit

against a non-debtor would reduce the amount of that creditor's claim against the estate, leaving

more of the estate for other creditors. *See, e.g.*, <u>In re Fry</u>, 1997 WL 666152, * 5 (Bankr. N.D. Ill.

Oct. 28, 1997); <u>Daley</u>, 224 B.R. at 311; <u>In re Confidential Investigative Consultants, Inc.</u>, 178 B.R.

739, 750 (Bankr. N.D. Ill. 1995); <u>In re Bill Cullen Elec. Contracting Co.</u>, 160 B.R. 581, 583-84

(Bankr. N.D. Ill. 1993); <u>Shuman</u>, 277 B.R. at 651. Perhaps these courts perceive that a potential

reduction in one creditor's claim and the resultant increase in the other creditors' pro rata share of

estate assets is "important to winding up the estate."

15

In Fry, the court analyzed whether it had "related to" jurisdiction over a breach of fiduciary duty count in a complaint brought by a creditor against two non-debtor third parties. In reaching its decision, the court noted that "[t]he only possible effect this action could have on the estate is the potential reduction of [the creditor's] claims against the estate if successful." 1997 WL 666152, at * 5 (citing Churchill Cabinet Co. v. Continental Illinois Nat'l Bank and Trust Co. of Chicago (In re Destron), 38 B.R. 310 (N.D. Ill. 1984); Enesco Corp. v. Callaway, 1990 WL 114198 (N.D. Ill. 1990)). The chapter 7 trustee in the Fry case had filed a "no-asset report," indicating that in his opinion there were no assets in the estate to administer. The court therefore concluded that "any potential recovery by [the creditor] against [the] defendants will not affect the amount of property available for distribution or the allocation of property among creditors. A reduction of [the creditor's] claim against the estate is inconsequential as the estate currently contains no assets and [the creditor's] claim does not attempt to recover any assets for the benefit of the estate. To put it simply, something from nothing equals nothing." Id. There being no effect on the estate, the court dismissed the counts for lack of jurisdiction.

In Daley, the court considered its jurisdiction over claims for unjust enrichment, fraud and breach of fiduciary duty brought by a creditor against non-debtors. The court, relying on the "pool of oil" example in Xonics, conjectured:

> If [the creditor] is paid by [the third parties], [its] unsecured claim against the estate will be satisfied. Assuming, without deciding, that [the third parties] would not succeed to [the creditor's] claim, this would reduce the total unsecured claims asserted against the estate.

Daley, 224 B.R. at 314.

The Daley court noted that a no-asset report had been filed by the bankruptcy trustee in that

16

case. The court did not, however, rely on the no-asset report to dismiss for lack of subject matter jurisdiction. Rather, the court noted that it remained to be seen whether the trustee's assessment concerning the lack of assets in the estate would prove to be correct. The court went on to conclude that it could not determine whether the potential reduction in the creditor's claim would have an effect on the estate because the creditor had failed to present evidence in support. The court observed: "Ordinarily, this would mandate that I dismiss the claims because of the plaintiff's failure to establish subject matter jurisdiction." Id. at 315. The court did not dismiss, however, choosing instead to give the parties an additional chance to supplement the record because of their unfamiliarity with "arcane issues of bankruptcy jurisdiction" and their plain lack of appreciation of "the complexity of the issues between them." Id.

Another court has rejected the premise that the potential reduction in a creditor's claim resulting from a third-party lawsuit could constitute an effect on the estate sufficient to confer "related to" jurisdiction. See In re Doctors Hospital of Hyde Park, Inc., 308 B.R. 311, 317 (Bankr. N.D. Ill. 2004) ("The mere possibility that a creditor might recover from a non-debtor and thereby reduce the amount of the creditor's claim against the debtor is not sufficient to bring that claim within the 'related to' jurisdiction of the court."). Such a view honors a test of relatedness described as narrow and avoids allowing into bankruptcy court a wide range of non-core proceedings. See id. Indeed, the Seventh Circuit admonishes bankruptcy courts to "be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes in which some party . . . may be bankrupt." Kubly, 818 F.2d at 645. As noted earlier, it is important to keep in mind that the warnings against excessive expansion of "related to" jurisdiction have their basis in Constitutional concerns.

17

While the rejection of the potential reduction in claim effect is therefore understandable, it nonetheless appears to be in tension with the application of the Seventh Circuit's test. For example, the Empire State Building hypothetical in <u>Xonics</u> seems to hold open the possibility that the mere potential reduction of a claim resulting from a third party dispute may constitute a sufficient effect on the estate to confer jurisdiction. *See* <u>Xonics</u>, 813 F.2d at 132 ("If a reduction of A's debt left more money for Creditor C . . . , then the decision who owned the Empire State Building still would be important to the winding up of the estate. There would be jurisdiction in the district court - and in the bankruptcy court on the parties' consent - under § 157(c)(1).");[3] *see also* <u>Home Ins.</u>, 889 F.2d at 749 (a nexus to the bankruptcy case based on convenience and consistency is not enough unless there is a financial effect on the estate or the "apportionment among its creditors"). Moreover, there is no mention in the <u>Xonics</u> hypothetical of the fact that the fight over the building was yet to be decided, and was thus too remote, speculative, contingent, tangential or potential to have an effect. Given this tension, what can be said at this point is that there is no easily identifiable demarcation of the outside bounds of "related to" jurisdiction. *See* <u>River Oaks, L.P. v. Things Remembered, Inc.</u>, 1993 WL 147409, * 3 (N.D. Ill. May 03, 1993).

In this matter, the court need not decide exactly where to mark the outside line. Assuming, *arguendo*, that the mere possibility of a reduction in a claim resulting from an undetermined third-

---

[3]

In <u>Xonics</u>, two creditors (Elscint and First Wisconsin) with competing security interests were fighting over a pool of money abandoned by the debtor in possession. In its plan of reorganization, the debtor had set aside $1.3 million of estate money for unsecured creditors. Elscint argued that if it recovered from the abandoned pool of money, the $12 million unsecured portion of its claim against the estate would be reduced, thus leaving more of the $1.3 million fund for the debtor's other unsecured creditors. First Wisconsin argued that the other creditors would do equally well no matter what happened to the abandoned pool of money. The Court remanded the matter to the District Court for consideration of these contentions. There appears to be no reported decision after remand, however, that reveals whether or how the District Court decided the issue.

party lawsuit constitutes a sufficient effect to confer jurisdiction, Gourmet has failed its burden to demonstrate that effect.

The court first notes in this regard that Gourmet alleges in the Amended Complaint that this court has core jurisdiction over the entire complaint, including the causes of action for fraud. That allegation is clearly incorrect as the causes of action encompassed in Counts IX and XI do not arise under the substantive law of the Bankruptcy Code or only in the context of a bankruptcy case.

Perhaps realizing its patent error in the Amended Complaint, Gourmet argues in its brief that the fraud counts are non-core proceedings. Moreover, Gourmet recognizes that any effect on the bankruptcy estate would have to derive from a potential reduction in Gourmet's claim. Specifically, if Gourmet is successful in obtaining a judgment in its favor against Stillman and Greenberg and is able to recover all or even some of that judgment from one or both of them, Gourmet's claim against Sage's bankruptcy estate would be reduced, if not eliminated. As a result, the other general unsecured creditors of Sage may receive a larger dividend if and when the Trustee eventually divies up the assets of Sage's bankruptcy estate. While the argument is clear, Gourmet offers no facts in support.

As discussed above, there are two types of challenges to jurisdiction, facial and factual. Where the ultimate question concerns whether the dispute has an effect on the estate, the challenge is a factual one. Daley, 224 B.R. at 311. Consequently, Gourmet bears the burden to support its jurisdictional allegations and arguments with competent proof. United Food & Commercial Workers Union v. Centermark Properties Meriden Square, Inc., 30 F.3d 298, 301 (7th Cir. 1994) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936)).

Gourmet has not submitted evidence amounting to competent proof. Gourmet filed with its brief a "Request to Take Judicial Notice" of certain matters that do not appear to bear on jurisdictional issues. Further, Gourmet, while incorrectly placing the burden on the defendants, states: "The court may also consider evidence submitted by the parties when determining the existence of subject matter jurisdiction, *see Remer*, 205 F.3d at 996, but none has been submitted by the defendants, nor does [Gourmet] believe that any additional evidence is necessary to resolve this issue." (The Gourmet Center, Inc.'s Opposition to Motions to Dismiss Complaint Filed by Stillman and Greenberg (Re Counts IX-XI, XIV), and LaSalle Bank (Re Counts XII-XIV), Each as Supplemented by Motions Re Jurisdiction and Standing; and Trustee's Submission Re Issues of Jurisdiction and Standing," ("Gourmet's Opposition") pp. 9-10, footnote 11).

In short, Gourmet has not adequately demonstrated a reasonable probability that the resolution of the fraud claims affects the amount of property available for distribution or the allocation of property among creditors. The court therefore concludes that it lacks subject matter jurisdiction over Counts IX and XI, and those counts will be dismissed. In light of this ruling, the court need not address whether Gourmet has pleaded fraud with adequate particularity under Rule 9, or assuming it did, whether the allegations of fraud state a claim under Illinois law.

**Subject Matter Jurisdiction Over the Causes of
Action Asserted in Counts I through VI
(PACA/PSA Relief Against Stillman, Greenberg and LaSalle)**

Some background concerning the trial on the PACA/PSA Counts is necessary to frame the jurisdictional issues regarding these counts. The trial on the PACA/PSA counts was held in accordance with the terms of an agreed order entered into by Gourmet and all of the defendants,

including LaSalle (the "Trial Order"). The Trial Order established a bifurcated hearing process and granted interim relief to Gourmet. Specifically, the parties agreed that they would "present evidence and argument" at the first hearing "necessary to resolve" certain "threshold requirements of PACA and PSA Trust Rights" claimed by Gourmet.

The Trial Order further provided that if the court "determines that [Gourmet] has Trust Rights," the defendants would provide an accounting to Gourmet, including dates of disposition and present location of goods and tracing of proceeds, and then a second hearing would be held on the accounting and any enforcement issues.

The Trial Order also included protections against dissipation of the alleged trust assets pending adjudication of the PACA/PSA Counts. Specifically, the Trial Order provided, *inter alia*, that the Trustee would continue to collect and turn over cash proceeds to LaSalle, and that LaSalle: (1) would continue to receive and hold such proceeds subject to Gourmet's trust rights, (2) would make Gourmet whole for any loss or dissipation caused by any defendant, and (3) would return any trust assets received by it following entry of a final and nonappealable order finding that Gourmet had valid and enforceable trust rights under PACA and PSA.

The court conducted the trial within the parameters and protections of the Trial Order. After considering the evidence and applying the law, the court held that no trust arose under PACA/PSA upon sale of the Goods by Gourmet. The court therefore concluded that the Trustee was entitled to a judgment on partial findings on Counts I through VI. In reaching this conclusion, the court noted that there is no question that the court has subject matter jurisdiction to determine whether a statutory trust exists, because the bankruptcy court always has jurisdiction to determine whether property constitutes property of the estate.

The court observed, however, that to the extent the PACA/PSA Counts sought relief against non-debtor third parties, they appeared to be unrelated to the bankruptcy case, *i.e.*, a suit by one creditor against non-debtor third parties that has no impact on the amount of assets in this estate or the allocation of assets among creditors. Having considered this issue further, the court perceives a distinction relative to the existence of jurisdiction over the PACA/PSA Counts as between Stillman and Greenberg on the one hand, and LaSalle on the other.

The court will address Stillman and Greenberg first. As pointed out by the Seventh Circuit, PACA trust rights may be enforced "through a reparation order issued by the Secretary of Agriculture and subsequent judicial enforcement . . . or through a court action for breach of fiduciary trust." Patterson Frozen Foods, Inc. v. Crown Foods, Intern., Inc., 307 F.3d 666, 669 (7th Cir. 2002). The latter remedy "permits recovery against both the corporation and its controlling officers." Id.

Accordingly, there may be PACA/PSA remedies that Gourmet has against Stillman and Greenberg as "controlling officers," assuming they fit within that definition. Gourmet may be successful in its "intramural squabble" with Stillman and Greenberg, and the result of such a success may even work to reduce the Gourmet Claim. However, as with the fraud counts discussed above, Gourmet has failed to establish if and how a reduction in the Gourmet Claim resulting from its PACA/PSA claims against Stillman and Greenberg would affect the recovery of Sage's other creditors.

Stillman and Greenberg, anticipating a favorable result on the merits of the PACA/PSA Counts, understandably argue that there is subject matter jurisdiction over those counts with respect to them (even though they argue a lack of jurisdiction as to the fraud counts). Their arguments in favor of jurisdiction are based on the "overlap" or "entanglement" of the PACA/PSA claims brought

22

against them with the PACA/PSA claims brought against Sage. While the argument is appealing from the standpoint of consistency and judicial economy, it is insufficient to support bankruptcy jurisdiction unless there also is a financial effect on the estate or the "apportionment [of assets] among ... creditors." Home Ins., 889 F.2d at 749. Neither effect is demonstrated here.

Stillman and Greenberg alternatively argue (in two or three sentences of their brief, without citation to authority) that since this court has jurisdiction to determine that no PACA/PSA trust exists, it also has jurisdiction over "all claims that flow from that finding." They appear to believe that this court has ancillary jurisdiction, which it does not. See In re Conseco, Inc., 305 B.R. 281, 286 (Bankr. N.D. Ill. 2004) (citing Fisher v. Federal Nat'l Mortgage Assn., 151 B.R. 895 (Bankr. N.D. Ill. 1993)); see also In re United Fruit & Vegetable, Inc., 191 B.R. 445, 451 (Bankr. D. Kan. 1996).

With respect to LaSalle, there are additional considerations regarding subject matter jurisdiction. The Cash Collateral Order provided that LaSalle's ongoing collection and application of cash collateral on account of its lien was subject to, *inter alia*, the rights of any third party under PACA and PSA. In addition, the Trial Order provided that if the court were to find that a valid trust existed, LaSalle would have to return any trust assets that it had previously applied to its secured claim. The ruling on the PACA/PSA Counts thus affects the amount and allocation to LaSalle of payments from the estate on account of its secured claim pursuant to the Cash Collateral Order. As such, it has the requisite effect on the administration of this estate within the purview of the Seventh Circuit authorities discussed above.

Accordingly, while the court concludes that it lacks subject matter jurisdiction over Counts I-VI as against Stillman and Greenberg, it finds that it has jurisdiction over those counts with respect

to LaSalle. Counts I through VI will therefore be dismissed as to Stillman and Greenberg, and the court will enter judgment by separate orders on Counts I through VI in favor of the Trustee and LaSalle and against Gourmet.


**Gourmet Lacks Standing to Bring the Causes of Action
Asserted in Counts X and XII (Breach of Fiduciary Duty Against
Stillman and Greenberg and Wrongful Inducement of Breach Against LaSalle)**

A party seeking judicial resolution of a cause of action must have standing to assert it. U.S. Const. Art. III. This requirement is both a constitutional limit on federal court jurisdiction and a prudential limitation on its exercise. Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). If a party lacks standing to assert a claim, there is no justiciable controversy and the court lacks jurisdiction as a matter of law. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

The Seventh Circuit Court of Appeals, citing to Lujan, has delineated the elements necessary to establish standing:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly ... traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 422 F.3d 490, 495 (7th Cir. 2005) (internal quotations and citations omitted). The party invoking standing bears the burden of proving all of the elements. Id. at 496. The burden changes at various points in the litigation. Id.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Id. (internal quotations and citations omitted).

"A motion to dismiss for lack of standing should not be granted unless there are no set of facts consistent with the complaint's allegations that could establish standing." Id. at 498. The Seventh Circuit has stated, however, that it is possible at the pleading stage for a plaintiff to "plead[] himself out of court," e.g., if more specific allegations contained in the complaint demonstrate that it would be necessary for the plaintiff to contradict his own pleadings in order to prevail. Kolupa v. Roselle Park Dist., 438 F.3d 713, 715 (7th Cir. 2006); Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir 1992), cert. denied, 508 U.S. 942, 113 S.Ct. 2421, 124 L.Ed.2d 643 (1993) (court is not required to ignore facts set forth in complaint that undermine the plaintiff's claims). Moreover, at the pleading stage, a court is not bound by the plaintiff's legal characterization of the facts, and the allegations need not be stretched beyond their sensible and reasonable implications. Alger v. City of Chicago, 753 F.Supp. 228, 231 (N.D. Ill. 1990) (citing Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2006, 45 L.Ed.2d 343 (1975)).

Once a company or an individual files bankruptcy, the bankruptcy trustee becomes the representative of the estate with standing to advance causes of action that the debtor could have commenced before the filing of the bankruptcy petition. Koch Refining v. Farmers Union Central Exchange, Inc., 81 F.2d 1339, 1343 (7th Cir. 1987), cert. denied, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988). "[R]ights of action against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, become property of the estate which the trustee alone

has the right to pursue after the filing of a bankruptcy petition." Id.; *see also* In re DeMert & Dougherty, Inc., 271 B.R. 821, 840 (Bankr. N.D. Ill. 2001) (breach of fiduciary duty claims are generally regarded as derivative claims).

Only a trustee has standing to assert a general claim on behalf of the creditors; he cannot, however, bring the personal claims of individual creditors. Koch Refining, 81 F.2d at 1343. Thus, whether a creditor has standing to assert a claim depends on whether the claim is personal to one creditor or general to all creditors. Id. A claim will be characterized as personal if the injury attendant thereto "is peculiar and personal to the claimant" as opposed to being "general and common to the corporation and creditors." Id. at 1349; *see also* In re Agribiotech, 319 B.R. 216, 221 (D. Nev. 2004) ("Where the injury alleged is primarily to the corporation, and is injury to the plaintiff creditor only insofar as it decreases the assets of the corporation to which he must look for satisfaction of his debt, then the suit is for a tort suffered by the corporation, and properly brought by the trustee") (*quoting* In re Western World Funding, Inc., 52 B.R. 743, 775 (Bankr. D. Nev. 1985)).

While clear in principle, the determination whether a claim is general to the corporation and creditors or unique to one particular creditor may be difficult in situations where the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors. In such a situation, the question to be answered is whether the injury to the creditor is "significantly different" from the injuries to other creditors in general. Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1280 (7th Cir. 1989). This inquiry should be made on a case by case basis. Dexia Credit Local v. Rogan, 2003 WL 22349111, *6 (N.D. Ill. Oct. 14, 2003).

The factual situation in Ashland Oil is instructive in this regard. The defendants in Ashland

26

Oil were two brothers, Toy and Thomas Arnett, who operated Arnett Oil, Inc., an oil distributing company. They were accused of "two episodes of fraud" perpetrated through their company. In the first "credit fraud" episode, the Arnett brothers and Arnett Oil's accountants were accused of inducing three of the oil supplier plaintiffs to extend credit to Arnett Oil through false and misleading financial statements and bogus promises of payment.

The "product fraud" episode involved the Arnett brothers' scheme to "lift" large amounts of oil from the plaintiffs' automatic petroleum terminals "before [the suppliers'] billing mechanisms could catch up and terminate Arnett Oil's credit."[4] Id. at 1274. Through both episodes of fraud, the brothers were able to obtain large amounts of oil on credit for Arnett Oil to distribute to its customers, thereby generating receivables. The receipts were used to pay down a line of credit which had been guaranteed by the Arnett brothers and their wives. While the brothers were being relieved of their own personal liabilities, however, the suppliers went unpaid and the company collapsed. Arnett Oil eventually filed a chapter 7 petition, and a trustee was appointed for the bankruptcy estate.

The oil suppliers filed a complaint in federal district court against, *inter alia*, the brothers and Arnett Oil's accountant under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a) and 1964(c). The Arnett brothers argued that the suppliers lacked standing to sue, because if in fact the brothers had wrongfully diverted the company's assets, that diversion constituted a breach of their fiduciary duties as officers of Arnett Oil. As such, only Arnett Oil's bankruptcy trustee could assert the action.

The Seventh Circuit disagreed, concluding that the suppliers had standing as they had shown

---

[4] The suppliers' terminals were operated on an honor system. Distributors such as Arnett Oil had access to the terminals through key cards.

27

an injury significantly distinct from the other creditors. The Court reasoned that "[a]lthough a part of the underlying scheme was the diversion of corporate assets (for which the trustee may well have a cause of action against the Arnetts) an essential part of the scheme, on which its success depended, was the fraudulent taking from the plaintiffs of exceptionally large quantities of fuel." Id. at 1280. In other words, the injury suffered by the plaintiffs as a result of the tapping of their particular terminals, i.e., the product fraud, was distinct from the injuries suffered by Arnett Oil's other creditors. See also United States Fidelity & Guaranty Co. v. Jepsen, 1991 WL 156063, *7 (N.D. Ill. Aug. 7, 1991) (creditor showed unique injury where "although a part of the alleged scheme involved [company's] diversion of contract balances owed to creditors of [debtor's] estate, the scheme also encompassed [officer's] efforts to conceal [company's] assets from [the creditor]"); In re Elite Marketing Enterprises, Inc., 2001 WL 1669229, * 4-5 (Bankr. N.D. Ill. 2001) (chapter 7 trustee was party with standing to bring cause of action involving corporate president and bank's misleading efforts to preserve the debtor's appearance as a credit-worthy business).

Here, Gourmet alleges in the fiduciary breach counts (as well as all other counts) that it suffered injury as a result of Sage's failure to pay for the Goods. However, Gourmet does not allege that the injury it suffered from the purported breach of fiduciary duty is significantly different from those suffered by other creditors.

The court must assume at this point the truth of Gourmet's allegations that Stillman and Greenberg knowingly made false promises of full payment to on-credit suppliers in order to convince those suppliers to ship. The goods that were shipped became Sage's inventory, which protected LaSalle's security interest and facilitated LaSalle's additional advance from the Credit Facility. That advance was used to satisfy the Term Loan, thereby reducing the Guarantees, and the subsequent

28

sales of the inventory allowed Sage to pay off the increase in the Credit Facility. In Gourmet's words:

> A plan was created to keep the suppliers in credit terms until the Insiders terminated all payments, thus conserving cash while increasing receivables and inventory to achieve the desired "orderly liquidation," recognizing that a precipitous shut down would diminish receivable collectibility. In return, LaSalle agreed to roll the term loan into the revolving facility (even though, due to the default, it was not otherwise obligated to do so), thereby eliminating $2 million from the guarantees.

(Gourmet's Opposition, pp. 21-22).

The allegedly wrongful scheme resulted in a purported misuse of funds, or as Gourmet puts it, a "manipulation of corporate assets" to pay a secured creditor ahead of the unsecured creditors, in order to benefit Stillman and Greenberg individually. Their activities in this regard, according to Gourmet, constituted breaches of fiduciary duties owing to the insolvent Sage's creditors, causing the injury of non-payment. It is difficult to see how the injury caused in this scenario was uniquely suffered by Gourmet. Indeed, Gourmet acknowledges the general nature of the injury in numerous allegations in the Amended Complaint and statements in Gourmet's Opposition. *See e.g.*, Amended Complaint, ¶ 36 ("Accordingly, the risk that the collateral would be inadequate for this purpose was shifted from LaSalle *to the creditors* in a manner designed to primarily benefit Stillman and Greenberg."); page 8 of Gourmet's Opposition ( *"Sage* was thereby [through the scheme] left with insufficient funds to pay suppliers such as [Gourmet]") (emphases added); page 15 of Gourmet's Opposition ("the allegations state a claim for general injury as well as unique injury").

In arguing for a personal injury resulting from the fiduciary breach, Gourmet focuses somewhat on the false representations made to it directly by Stillman and implicitly by Greenberg.

29

Granted, there may have been such representations; however, the focus in analyzing standing with respect to fiduciary duty breaches is not the directness of the dealings with the creditor, but the directness of the injury to the creditor. Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333, 1336-1337 (7th Cir. 1989) (finding that plaintiff lacked standing despite the plaintiff's direct dealing with defendant because direct dealing does not constitute direct injury for purposes of standing).

In short, Gourmet alleges a general injury, not an injury significantly different from the injuries to creditors in general resulting from the purported breach of fiduciary duty. Because the claims for breaches of fiduciary duty and inducement of breach as pleaded in the Amended Complaint are general, they belong to the estate and only the Trustee has standing to bring them.[5]

The court notes that in reaching this conclusion, it has been mindful that this proceeding is at the pleading stage and that significant leeway should therefore be given to the pleader. The court cannot, however, ignore the specific allegations of general injury in the Amended Complaint that are inconsistent with Gourmet's assertions of standing. Scott, 975 F.2d at 368, see also Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) (conclusory allegations need not be credited when they are belied by more specific allegations of the complaint). Dismissal is appropriate because in order for Gourmet to be successful in meeting its burden to demonstrate standing, it would have to contradict its own allegations.

---

[5] If a single creditor believes that the trustee is not aggressively pursuing a general claim for breach of fiduciary duty, it behooves the creditor to seek authority from the court to prosecute that lawsuit on behalf of the estate. See Fogel v. Zell, 221 F.3d 955, 965-66 (7th Cir. 2000); In re Perkins, 902 F.2d 1254, 1257-58 (7th Cir. 1990). Such a request was not made in this case. As pleaded, Gourmet wants a judgment in its favor alone to redress the purported harm suffered by Sage's unsecured creditor body. That request cannot lie.

Before proceeding to the next issue, the court notes that Gourmet captions the background section of the Amended Complaint as "Sage's Deepening Insolvency and the Resulting Breaches of Fiduciary Duty and Fraud." The use of the descriptive phrase "deepening insolvency" may lead the reader to think that Gourmet is asserting a cause of action for damages resulting from Sage's "deepening insolvency" precipitated by the actions of LaSalle, Greenberg and Stillman.

Deepening insolvency has been described as the "fraudulent expansion of corporate debt and prolongation of corporate life" beyond insolvency. In re Student Finance Corp., 335 B.R. 539, 548 (D. Del. 2005) (citing Official Committee of Unsecured Creditors v. R.F. Lafferty & Co, Inc., 267 F.3d 340, 347 (3rd Cir. 2001)). Some courts do not recognize deepening insolvency as an independent cause of action, but see it instead as a species of damages. See In re Fleming Packaging Corp., 336 B.R. 398 (Bankr. C.D. Ill. 2006); In re Vartec Telecom, Inc., 335 B.R. 631 (Bankr. N.D. Tex. 2005). It appears, however, that even for those courts who consider deepening insolvency a cause of action, the consensus places standing with the trustee. See Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d at 349; Student Finance, 335 B.R. at 547; J.B. Heaton, Deepening Insolvency, 30 JOURNAL OF CORPORATION LAW 465 (Spring 2005). In any event, Gourmet advises in its brief that it is not asserting deepening insolvency as a cause of action even though those words are used (and even highlighted) in the Amended Complaint.

For all these reasons, Counts X and XII of the Amended Complaint will be dismissed for lack of standing. Under the circumstances, the court need not decide whether they should be dismissed under Rule 12(b)(6).

## Count XIII States a Claim for Relief
## (Declaratory Relief Relating to a Reclamation Claim)

Gourmet's request for a declaration as to the validity of its reclamation claim is a core proceeding. In re Video King of Illinois, Inc., 100 B.R. 1008, 1011 (Bankr. N.D. Ill. 1989). Section 546(c) of the Bankruptcy Code is a seller's exclusive remedy in a bankruptcy case for exercising whatever reclamation rights it may be entitled to under non-bankruptcy law. Id. at 1013 n. 5.

Accordingly, as acknowledged by LaSalle, this court has subject matter jurisdiction over Count XIII, and there is no standing problem.   That leaves only the issues concerning dismissal pursuant to Rule 12(b)(6) and Rule 41(b).

## Rule 12(b)(6)

A complaint may not be dismissed under Rule 12(b)(6) unless no relief may be granted under any set of facts that could be proved consistent with the allegations in the complaint. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).  In ruling on the motion, the court must accept as true all facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff.  Jackson v. E.J. Brach Corp., 176 F.3d 971, 977-78 (7th Cir. 1999); Zemke v. City of Chicago, 100 F.3d 511, 513 (7th Cir. 1996).

To withstand a motion to dismiss, the pleading need only contain enough allegations to allow the court and the defendant to understand the gravamen of the plaintiff's complaint. McCormick v. City of Chicago, 230 F.3d 319, 325 (7th Cir. 2000); Thompson v. Illinois Dept. of Professional Regulation, 300 F.3d 750, 753 (7th Cir. 2002) (complaint must simply "give the defendant notice of the claims and the grounds they rest upon"); Kolupa, 438 F.3d at 714 ("[i]t is enough to name the plaintiff and the defendant, state the nature of the grievance, and give a few tidbits (such as the date)

32

that will let the defendant investigate"). Indeed, the specific legal theory need not be spelled out. Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992). The court should simply ask whether relief is possible under any set of facts that could be established consistent with the allegations. Id.

When reviewing a Rule 12(b)(6) motion, the court reviews the complaint, exhibits attached to the complaint, and supporting briefs. Thompson, 300 F.3d at 753; Beam v. IPCO Corp., 838 F.2d 242, 245 (7th Cir. 1988). The court is not, however, "'obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or assign any weight to unsupported conclusions of law.'" Thompson, 300 F.3d at 753-54 (quoting from R.J.R. Serv., Inc. v. Aetna Cas. and Sur. Co., 895 F.2d 279, 280 (7th Cir. 1989)).

As noted, section 546(c) of the Code is a seller's exclusive remedy for reclaiming goods once a bankruptcy case is commenced. It provides, in part:

> (c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under section 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but –
>
> (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods –
>
> (A) before 10 days after receipt of such goods by the debtor; or
>
> (B) if such 10-day period expires after the commencement of the case, before 20 days after receipt of such goods by the debtor.

11 U.S.C. § 546(c).

To demonstrate the validity of a reclamation claim against a debtor in bankruptcy, the seller

must establish: "(1) a statutory or common law right to reclaim the goods; (2) the goods were sold in the ordinary course of business; (3) the debtor's insolvency when it received the goods; (4) a written reclamation demand made within 10 days after debtor's receipt of the goods and (5) debtor's possession of the goods at the time the written reclamation demand was received." In re Phar-Mor, Inc., 301 B.R. 482, 493 (Bankr. N.D. Ohio 2003) (citations omitted).   It is important to note that the question of validity of the reclamation claim is different from the question of its worth. Matter of Reliable Drug Stores, Inc., 70 F.3d 948, 950 (7th Cir. 1995).

Illinois provides a statutory right to reclamation in its version of the Uniform Commercial Code. 810 ILCS 5/2-702(2). A seller's right to reclaim goods, however, is subject to the rights of a "good faith purchaser." 810 ILCS 5/2-702(3); Reliable Drug, 70 F.3d at 950 (reclamation claim is subject to, but not extinguished by, interests of good faith purchasers under UCC § 2-702(3)).

A "purchaser" is defined as "a person who takes by purchase." 810 ILCS 5/1-201(33). "Purchase" encompasses the taking of property through a security interest, 810 ILCS 5/1-201(30), and "persons" include financial institutions. 810 ILCS 5/1-201(32).

"Good faith" is defined as "honesty in fact in the conduct or transaction concerned." 810 ILCS 5/1-201(19). "The standard for determining 'good faith' is a subjective one and rests on the facts of each case." Monsanto Co. v. Walter E. Heller & Co., Inc., 449 N.E.2d 993, 1000 (Ill. App. Ct. 1983) (citing Walter E. Heller & Co., Inc. v. Convalescent Home of the First Church of Deliverance, 365 N.E.2d 1285 (Ill. App. Ct. 1977)).   The existence of good faith is an "inherently factual" question "to be resolved at trial." Video King, 100 B.R. at 1015 n. 9.

Gourmet alleges in the Amended Complaint that with respect to $81,000 worth of the Goods shipped to Sage, it made a written demand within the ten-day statutory period.   (Amended

34

Complaint, ¶ 130). Gourmet further alleges that LaSalle is not a good faith purchaser, pointing to the facts alleged in the remainder of the Amended Complaint. Gourmet contends, in part, that LaSalle did not exercise good faith when it made the advance under the Credit Facility, because it colluded with Sage to satisfy its loan at the expense of other creditors, all as more fully described above. According to the Amended Complaint, LaSalle knew, at the time of the activities in question, that the promises of payment made to Sage's suppliers were false and reckless. In short, "Stillman and Greenberg planned their 'orderly liquidation' [that only they and the Bank knew about] with LaSalle's assistance, to benefit themselves at the expense of their suppliers." (Amended Complaint, ¶ 35).

The gravamen of Gourmet's Amended Complaint is understandable. In attempting to trump LaSalle's superior position *vis-a-vis* the reclamation claim, Gourmet is attacking LaSalle's good faith status. Granted, there is law to the effect that a lender does not act in bad faith when it takes commercially reasonable actions, such as termination of funding for a failing business. *See* In re Arlco, Inc., 239 B.R. 261, 271 (Bankr. S.D.N.Y. 1999). It may be that Gourmet will be unable to demonstrate misconduct on LaSalle's part sufficient to establish an absence of good faith. However, that remains to be seen at trial. The court cannot presently conclude beyond a doubt that Gourmet can prove no set of facts consistent with the Amended Complaint entitling it to relief. Accordingly, the court will not dismiss Count XIII pursuant to Rule 12(b)(6).

**The Court will not Dismiss Counts
against LaSalle Pursuant to Rule 41(b)**

LaSalle's final argument in support of dismissal rests on Gourmet's purported failure to

comply with the Agreed Order. As noted above, that order permitted Gourmet to file an amended complaint, "including Counts IX and X." In the Original Complaint, Gourmet sought to hold LaSalle liable under the PACA/PSA Counts (Counts I-VI). When the Amended Complaint was filed, it did not include prayers for relief against LaSalle under the PACA/PSA Counts.

LaSalle takes issue with what it presumably considers to be an amendment of the Original Complaint in the form of the withdrawal of LaSalle from the PACA/PSA counts. LaSalle contends that the amendment exceeded the leave given to Gourmet in the Agreed Order. LaSalle is understandably distressed that Gourmet dropped LaSalle from the PACA/PSA Counts after the court had already conducted a trial on those counts. Indeed, LaSalle believes that Gourmet's conduct in this regard warrants an involuntary dismissal with prejudice under Rule 41(b) of all counts asserted against LaSalle.

Under Rule 41(b), a court may dismiss a claim against a defendant with prejudice "[f]or failure of the plaintiff to prosecute or to comply with [the Federal Rules of Civil Procedure] or any order of court." Fed. R. Civ. P. 41(b). Dismissal under Rule 41(b) is a harsh penalty that should be imposed only in extreme circumstances, to avoid depriving a litigant of its day in court. Palmer v. City of Decatur, 814 F.2d 426, 429 (7th Cir. 1987). "The drastic nature of a dismissal with prejudice requires the action to be used 'only in extreme situations, when there is a *clear record of delay* or contumacious conduct, or when other less drastic sanctions have proven unavailable." GCIU Employer Retirement Fund v. Chicago Tribune Co., 8 F.3d 1195, 1199 (7th Cir. 1993) (*quoting Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1061 (7th Cir. 1989) (emphasis in original)).

The court will not dismiss the counts against LaSalle pursuant to Rule 41(b). It cannot be

36

said that there is a clear record of persistent delay or contumacious conduct. For one thing, the Agreed Order by its express terms did not limit the leave to amend to certain counts of the Amended Complaint. In addition, assuming that lesser alternative sanctions would be warranted, LaSalle does not discuss what those alternatives may be or whether they would prove to be unavailable.

Finally, Rule 41(b) may not be the appropriate rule to look to in this situation. Rule 41(b) addresses involuntary dismissals. The withdrawal of the demand for PACA/PSA relief against LaSalle is more like a voluntary dismissal under Rule 41(a), as opposed to a violation of an order giving leave to amend warranting involuntary dismissal under Rule 41(b).

Rule 41(a) requires court approval of voluntary dismissals after the defendant has answered and on "such terms as are just." Gourmet did not seek approval of the dismissal of LaSalle from the PACA/PSA Counts.

## Count XIV will be Stricken as Redundant

As noted above, Count XIV of the Amended Complaint is a rehash of the relief sought in the prior thirteen counts of the Amended Complaint. On the court's own initiative pursuant to Rule 12(f), Count XIV will be stricken as redundant. *See* Williams v. Jader Fuel Co., Inc., 944 F.2d 1388, 1400 (7th Cir. 1991); Geschke v. Air Force Ass'n, 2002 WL 31253746, * 1-2 (N.D. Ill. Oct. 8, 2002).

## CONCLUSION

For the reasons stated, the court will enter separate orders dismissing Counts IX, X, XI and

XII of the Amended Complaint, dismissing Counts I-VI as to Stillman and Greenberg, and striking

Count XIV. The court will also enter judgments in favor of the Trustee and La Salle on Counts I-VI.

A status hearing on this adversary proceeding will be scheduled for May 10, 2006 at 10:30 a.m.


Dated:    APR 2 8 2006

ENTER:

Susan Pierson Sonderby
United States Bankruptcy Judge